Filed 8/16/19

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>            v.<br><br>DAVID LEE MCDANIEL III,<br><br>      Defendant and Appellant. | F075749<br><br>(Super. Ct. No. 1480530)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Stanislaus County.  Nancy Ashley, Judge.

Arguedas, Cassman & Headley and Raphael M. Goldman, Law Office of Dan Roth and Dan Roth, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Jesse Witt, and Ivan P. Marrs, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*      Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part I of the Discussion.

David Lee McDaniel III appeals from multiple convictions for robbery arising from robberies at several stores and restaurants in Patterson and Westley. He challenges the admission of his police-interrogation statement; the admission of a text exchange between his mother and him, to show an adoptive admission on his part that he committed multiple, local robberies; the admission of a book (and related documents) about ostensible identity fraud, found in his car; the admission of cell phone records from his cellular carrier; and the admission of evidence of his height and weight based on DMV records. He also challenges the trial court's denial of his motion to sever the robbery charges for purposes of trial.

We conclude the trial court properly admitted McDaniel's police-interrogation statement. However, admission of the text exchange between McDaniel and his mother to show an adoptive admission of guilt on his part, and of the book and documents found in his car, was error. We further conclude that these errors, taken together, were prejudicial. We therefore reverse and remand for further proceedings consistent with this opinion.[1]

## PROCEDURAL HISTORY

McDaniel was charged by an information filed in the Stanislaus County Superior Court. The information alleged 10 counts of robbery relating to six separate incidents in which retail establishments in Patterson and Westley were robbed. (Pen. Code,[2] § 211.) The robberies at issue occurred over a period ranging from June 2014 to October 2014. A jury convicted McDaniel of nine of the 10 robbery counts alleged in the information. The nine counts of conviction related to robberies at a Papa Murphy's Take 'N Bake Pizza (Papa Murphy's) store (counts 1, 2), a McDonald's restaurant (counts 3, 4), a CVS

---

[1]     Our disposition makes it unnecessary to address McDaniel's remaining contentions.

[2]     Subsequent statutory references are to the Penal Code unless otherwise specified.

2

store (count 5), an AutoZone store (counts 7, 8), and a Subway restaurant (counts 9, 10).[3] The remaining count, count 6, related to a robbery at a MetroPCS store; McDaniel was acquitted of this count.

The information also included prior conviction allegations as to all counts, based on two alleged prior convictions under section 211 that were dated April 7, 2003. More specifically, the information alleged, as to each count, that McDaniel had suffered two prior convictions for a serious felony (§§ 667, subd. (a), 1192.7, subd. (c)) and two prior convictions for a serious or violent felony (§§ 667, subd. (d), 1192.7, subd. (c), 667.5, subd. (c)). The information further alleged, based on the two prior section 211 convictions, that McDaniel had served a prior prison term (§ 667.5, subd. (b)). The trial court found, in a bifurcated proceeding, that the prior conviction allegations attached to the counts of conviction were true.

McDaniel was sentenced to an indeterminate term of 125 years to life in prison on his convictions. He was sentenced to an additional determinate term of 25 years on the sentence enhancements alleged under section 667.5, subdivision (a). His aggregate sentence therefore was 150 years to life in prison.

## FACTS

The instant robbery charges stemmed from six incidents at six separate stores or restaurants. Law enforcement was able to obtain surveillance videos of all but one of the incidents. The fact that the robberies occurred was not in dispute at trial. The issue at trial was whether McDaniel was the robber in each instance. The robber's face was obscured in all the videos. Furthermore, Stanislaus County Sheriff's Detective Michael Andriese testified that no witness identified McDaniel as the robber in any of the robberies at issue. The case against McDaniel was therefore entirely circumstantial.

---

**3**    All the affected establishments were located in Patterson with the exception of the Subway, which was in Westley.

*A. The Robberies*

**1. Robbery at Papa Murphy's, June 7, 2014**

A Papa Murphy's pizza store in Patterson was robbed of $400 from the cash register at approximately 8:40 p.m. on June 7, 2014 (the store's closing time was 9:00 p.m.). A video of the incident was played for the jury. Two Papa Murphy's employees, McKayla B. and Christine D., were in the store at the time of the robberies and testified at trial.

McKayla testified, with reference to the video, that a man walked into the store, "grabbed" her "by the neck," and guided her towards her coworker (Christine). The man asked McKayla and Christine to open the register and the safe. They opened the register for him but told him they did not have access to the safe. "[The man] told [McKayla and Christine] to go and kneel on the ground." He "started taking out all of the bills" from the register.

McKayla testified the man was six feet one inch or six feet two inches tall and "pretty built." She estimated he weighed about 210 pounds. His face was partially covered with a "black mask" of a camouflage-type material. He was wearing "work pants and a black hoodie" and "light" camouflage gloves. McKayla reconfirmed the gloves were light-colored.

McKayla noted she did not see any weapon on the man. However, the man had his left hand in his pocket as if he was holding something, which gave the impression he had a weapon.

Christine corroborated McKayla's testimony, adding the man was "[o]f African American descent." Neither McKayla nor Christine identified McDaniel as the robber.

**2. Robbery at McDonald's, June 11, 2014**

A McDonald's restaurant in Patterson was robbed of $346.48 from two cash registers at approximately 9:30 p.m. on June 11, 2014 (the restaurant's closing time was

11:00 p.m.). Employees N.S., Belen R., and Jose G. were working at the McDonald's at the time of the incident. Surveillance video clips of the incident were played for the jury. N.S. and Belen also testified for the People.

With reference to the video clips, N.S. testified that a man walked into the restaurant; he may have been "black or dark Hispanic." He was wearing dark glasses and gloves. He had his hand under his shirt to suggest he might have a gun. He was also holding a large burlap bag; the bag was about two and a half feet square. He asked N.S. to open her register; N.S. called to Belen, her manager, to come over and open the register. The man slid the drawer out of the register, put the drawer in his bag, and "ran out the door."

Belen, for her part, added that the man was Black, weighed about 270 pounds, was wearing black gloves, and his lower face was covered with a camouflage bandana. Belen opened two registers for the man, who took the drawers out of the registers and placed them in "his sweater or a bag" and "[t]hen he just left."

A statement from Jose was admitted into evidence by stipulation. Jose stated that he believed the person who robbed the McDonald's was a "black male." The man was at least six feet tall and wore a "green camouflage bandana around his face."

### 3. Robbery at CVS, June 14, 2014

A CVS store in Patterson was robbed of $200 from a cash register at approximately 9:35 p.m. on June 14, 2014. Surveillance video clips of the incident were played for the jury. Jessica B., who was working at the CVS at the time of the incident, testified for the People.

Jessica testified she was ringing up a customer at the cash register on the store's front counter, when a man entered the store. She explained: "Well, what I thought was another customer coming in turns out wasn't a customer. Just completely walked in like nothing, came behind the counter and told us to get on the floor and open the register.

5

Once he got his money, he just left." She added she could not see the person's face because "he was wearing a hoodie and had a bandana over his [nose and mouth] – just showing basically his eyes." The person appeared to be African American based on the visible areas of skin. The person had a bag in one hand (the bag appeared to be a tan fabric bag) and kept the other hand in a pocket. Jessica did not know what, if anything, was in the pocket. She noted: "It just looked like the hand was in there and that was about it." The person was wearing "the kind of gloves that don't have the fingertips on them," i.e., "cutoff" gloves. Jessica described the person as a "big guy." She observed: "Very tall. At least six-foot. Little bulky, heavy. I don't know how heavy, though. I'm not too sure. Just a big guy, maybe weighed like 300 [pounds] or so."

Carmen R. also testified about the CVS incident. Carmen was a CVS warehouse employee who was shopping at the CVS store at the time of the incident. Carmen corroborated Jessica's version of events and description of the robber. Carmen testified the robber had his hand in his pocket "the whole time." Carmen "didn't see anything" in his pocket but assumed it was "like, a gun or something." She testified: "I just stood there. He got the money and he left." Carmen described the robber as "dark skinned"; she also noted he was five feet 11 inches or six feet tall and weighed about 200 pounds.

The police obtained additional information to the effect that a "small, red sedan" was associated with the robbery. Police conducted an unsuccessful search for the vehicle in the area around the CVS.

**4. Robbery at MetroPCS, July 25, 2014**

The MetroPCS store in Patterson was robbed of $1,912 on July 25, 2014. McDaniel was *acquitted* of this robbery.

MetroPCS employee Juan V. testified that, on the day in question, the robber approached the store counter, asked Juan to hand over money from the cash register, and, as he was leaving, instructed Juan to sit on the floor. Juan described the robber as a

6

"black guy" with a patchy, "scruffy looking beard." He was "probably like 6'2'' [tall]," and weighed "around 230" pounds. The robber was wearing a "straw fedora hat" that was pulled down to the bridge of his nose.

Esther B., a customer who was present in the store at the time of the robbery, provided a statement that was admitted into evidence through stipulation. Esther described the robber as a "light-skinned black male, possibly in his mid-thirties," wearing a rimmed beige hat, a long-sleeved shirt, "possibly beige pants," and "black and yellow cloth-type gloves." She described the robber as about five feet 11 inches tall and overweight, weighing 200 to 230 pounds.

### 5. Robbery at AutoZone, August 19, 2014

On August 19, 2014, the AutoZone store in Patterson was robbed of approximately $590. A video of the incident captured by surveillance cameras at the store was played for the jury. Two employees, Armando S. and Miguel M., were working at the AutoZone store when the incident occurred. Armando testified for the People.

Armando testified that he was called to the front of the store by Miguel, where Armando saw a "black male about six and a half feet [tall]," "[h]eavyset, about 280 to 300 pounds, wearing a blue [hoodie], and like a black rag on his face." The black rag or cloth hung to the man's "waist line"; Armando could "only see his eyes." The man asked Armando to open the cash register. Armando "stepped over to the register," "opened it up," and "put the money" into a black fabric bag that the man was holding open. Armando added: "He had his hand in his pocket, and it seemed like he had something on his hand or something, but it wasn't visible because it was in his pocket." The man was not wearing gloves. Armando continued: "He just said, 'Give me the money.' [¶] He was actually – actually really nice, with a calm voice. 'Don't worry, it's not your money. Just give it to me.' [¶] So that's what I did. [¶] That's pretty much – did what he was

7

asking [me] to do. That's what I was told to do in case of an event like this one." As the man left, he said, " 'Can you get on the ground?' " He also used the word "avajo," which is a Spanish word meaning "down."

A statement attributed to Miguel was admitted into evidence by stipulation. Miguel described the AutoZone robber as a Black male adult, about six feet four inches or six feet five inches in height and weighing approximately 280 pounds. The man was wearing a blue sweatshirt with a white logo on the front, a black cloth over his face, and black mechanic-type gloves.

**6. Robbery at Subway, October 19, 2014**

On October 19, 2014, $1,270 was stolen during a robbery at a Subway in Westley. Video clips of the incident were played for the jury. R.K. and Rosa R. were working at the Subway when the robbery occurred. R.K. testified for the People.

R.K. explained that a man entered Subway and asked for money from the cash register. R.K. opened the register and he took the money in there. After R.K.'s recollection of the incident was refreshed with reference to a statement she had given to the police, R.K. testified the man had threatened to shoot unless she opened the register. After R.K.'s recollection was refreshed again, she added that the man took the money from the register and put it in a black cloth.

The robber was all covered up in black clothing and wore gloves. He even had "like, [a] beanie over [the] nose," which covered his face and left only his eyes visible. Consequently, R.K. could not determine his race, skin color, or features at all. R.K. did not provide estimates of other physical characteristics of the robber other than to observe that he was taller than she was.

A statement from Rosa was admitted into evidence by stipulation. Rosa described the robber as an adult Black male, who was about six feet tall, had a heavy build, wore black clothing, a black beanie, black gloves, and a black cloth over his face.

8

Surveillance video later obtained from a hotel north of the Subway shop showed a white SUV going in one direction and then the other, on a street to the west of the hotel.

## B. *The Police Investigation*

### 1. Officer Testimony

Stanislaus County Sheriff's Detective Michael Andriese was the lead investigator on the case. Andriese testified that the sheriff's office publicized the robberies, including by sending "local flyers" to other law enforcement agencies as well as press releases to various newspapers. The press releases included details of the robberies and images of the suspect (i.e., still shots obtained from video clips), whereby the suspect's photograph was released to the public.[4] A newspaper article published in the local newspaper, the Patterson Irrigator, provided details of the robberies and asked for cooperation from the public in providing information about the robberies to, and identifying the suspect for, the police. Eventually a "citizen" contacted Andriese and advised him that McDaniel was a "possible suspect." The police were also advised of other suspects, including M.S. and P.C.

P.C. was a "large-statured black male, heavier set," who generally "fit the description of the suspect in the [instant robberies]" and was "arrested for a burglary at the Wal-Mart in Patterson around the same time." Police did not further investigate P.C. after witnesses to the instant robberies failed to identify him in a photo lineup.[5]

The witnesses to the instant robberies also failed to identify M.S. in a photo lineup. After a robbery at the MetroPCS store in Patterson, M.S. was located two miles

---

[4] One of the flyers disseminated by the police was introduced into evidence. It provided information on the robberies at Papa Murphy's and McDonald's, which occurred on June 7, 2014, and June 14, 2014, respectively. The flyer was dated June 17, 2014, indicating that the police disseminated information about the robberies as they occurred.

[5] Witnesses to the robberies did not identify McDaniel in photo lineups either.

away at a sports complex but did not appear nervous. M.S.'s nonchalant demeanor suggested he was not the suspect police were looking for. Andriese did not further investigate M.S. as a suspect with regard to any of the robberies.

Officer Erik Peterson of the Livermore Police Department also testified for the People. Peterson had earlier worked for the Stanislaus County Sheriff's Department, where he participated in the investigation into the instant robberies. Peterson testified that McDaniel lived in an apartment in Patterson. The police obtained search warrants to search McDaniel's house and vehicle. On October 31, 2014, at 7:45 a.m., as the police "were getting ready to serve the search warrant," McDaniel emerged from the apartment and drove off in his white Ford Explorer. Peterson followed McDaniel and conducted a traffic stop on the Ford Explorer. Peterson then conducted a search of the Explorer pursuant to a search warrant. There was a black duffle bag in the hatch area; the duffle bag contained a black mechanic-style glove. A black satin bag was found in the rear seat area. There was a black beanie in the Explorer as well.

McDaniel's apartment was also searched (McDaniel's girlfriend lived at the apartment too). The police searched the closets, which contained men's and women's clothing as well as several pairs of shoes. A black do-rag, which Peterson described as a "head covering of sorts," was found in one of the closets. Among numerous pairs of shoes in the closets was a pair of blue, gray, and black Adidas shoes, a pair of gray and white Adidas shoes, and a pair of brown work boots. A black jacket (no hood) was found among the clothes in the closet.

Detective Andriese testified that the video of the AutoZone robbery showed the robber wearing gray shoes with black laces. Andriese also testified that the video of the Subway robbery showed the robber wearing gray and white shoes. (The shoes in the video are, however, indistinct, and in contrast to his trial testimony, at the preliminary hearing Andriese testified the shoes worn by the Subway robber looked like the pair of

10

*brown* work boots found in McDaniel's closet.)  Video from the Subway robbery showed the robber wearing a dark or black glove on his left hand; the black glove found in the duffle bag in McDaniel's Ford Explorer was a left hand glove.

Andriese testified McDaniel's apartment was in the vicinity of all the Patterson businesses that were robbed but was 10 miles away from the Westley Subway that was robbed.

Andriese testified the cash register drawers taken during the McDonald's robbery were recovered and returned to McDonald's.  The drawers were not fingerprinted.  Andriese indicated fingerprinting the drawers would probably have been a good idea.

Andriese also confirmed no witness had identified McDaniel as the robber in relation to any of the robberies.

### 2.  Police Interrogation

McDaniel was interrogated upon his arrest in this matter.  A redacted version of his interrogation statement was admitted into evidence.

### 3.  Cell Phone Evidence

Stanislaus County District Attorney Investigator Darren Ruskamp testified as a "cellular forensic expert" regarding how cell phones work as well as the content of cellular network records.  He interpreted records regarding McDaniel's cell phone obtained from McDaniel's cellular provider.  Ruskamp testified there was one cell phone tower in Patterson and another one in Westley.  McDaniel's phone was used somewhere in the area covered by the Patterson cell tower on the days on which the robberies at Papa Murphy's and CVS occurred.  McDaniel's phone was not used on the day on which the McDonald's robbery occurred.  On the day of the AutoZone robbery, McDaniel's phone either made or received a call at some point in the day; however, the expert did not specify that the local Patterson cell tower was used to connect that call.  As for the day on which the Westley Subway robbery occurred, McDaniel's phone was used to make a call

11

that day.  However, on that occasion, McDaniel's phone connected to the cell tower in Patterson, which likely did not cover the Westley area.

## DISCUSSION

### I.     *Admission of McDaniel's Interrogation Statement*[*]

Detective Andriese interrogated McDaniel after he was arrested in connection with the instant robberies.  The defense objected to admission of McDaniel's video-recorded custodial interrogation during the preliminary hearing and thereafter also moved in limine to exclude the interrogation at trial.  The trial court ruled, both times, that there was no *Miranda* violation and the interrogation was admissible.  (*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).)  At trial, the People played a redacted video recording of the interrogation for the jury.  McDaniel argues the trial court erred, under *Miranda*, in admitting the redacted interrogation statement.  We conclude the interrogation statement comported with *Miranda*'s requirements and was admissible.

Andriese's interrogation of McDaniel was video-recorded and the recording and corresponding transcript are included in the record on appeal.  Accordingly, we will independently determine whether the challenged interrogation was obtained in violation of *Miranda*.  (See *People v. Davis* (2009) 46 Cal.4th 539, 586; *People v. Jennings* (1988) 46 Cal.3d 963, 979 (*Jennings*); *People v. Gonzalez* (2005) 34 Cal.4th 1111, 1125.)  We apply federal standards in reviewing *Miranda* claims.  (*People v. Sims* (1993) 5 Cal.4th 405, 440.)

#### A.  Legal Framework Applicable to *Miranda* Claim

In *Miranda*, the United States Supreme Court stressed that "the modern practice of in-custody interrogation is psychologically rather than physically oriented," whereby "the very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on

---

[*]     See footnote, *ante*, page 1.

12

the weakness of individuals." (*Miranda*, *supra*, 384 U.S. at pp. 448, 455.) *Miranda* therefore established certain prophylactic safeguards that must be afforded to suspects, including the rights to remain silent and to have counsel present during a custodial interrogation. (*Id*. at p. 444.)

As indicated above, *Miranda* applies to questioning under the coercive conditions of official "custody." (*Miranda*, *supra*, 384 U.S. at p. 444 [custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way"]; *Rhode Island v. Innis* (1980) 446 U.S. 291, 300-301 (*Innis*) ["*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."]; *People v. Kopatz* (2015) 61 Cal.4th 62, 80.)

Once *Miranda* warnings have been given to a suspect in custody, if the suspect invokes his rights, "all questioning must cease." (*Smith v. Illinois* (1984) 469 U.S. 91, 98.) In other words, upon invocation of his rights, a suspect may not be subjected to further *interrogation*. (See *Berghuis v. Thompkins* (2010) 560 U.S. 370, 388 (*Berghuis*) ["[i]f the right to counsel or the right to remain silent is invoked at any point during questioning, further *interrogation* must cease" (italics added)].) "[T]he term 'interrogation' under *Miranda* refers … to express questioning" and "to any words or actions on the part of the police … that the police should know are reasonably likely to elicit an incriminating response." (*Innis*, *supra*, 446 U.S. at p. 301.)

On the other hand, "after giving a *Miranda* warning, police may interrogate a suspect who has neither invoked nor waived his or her *Miranda* rights." (*Berghuis*, *supra*, 560 U.S. at p. 388.) "Even absent the accused's invocation of the right to remain silent," however, "the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement." (*Id.* at p. 382.)

13

"The waiver inquiry 'has two distinct dimensions':  waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " (*Berghuis, supra,* 560 U.S. at pp. 382-383.)  " 'No effective waiver … can be recognized unless specifically made after the [*Miranda*] warnings … have been given.' " (*Id*. at p. 383, quoting *Miranda*, *supra*, 384 U.S. at p. 470.)

"The main purpose of *Miranda* is to ensure that an accused is advised of and understands the right to remain silent and the right to counsel." (*Berghuis*, *supra*, 560 U.S. at p. 383.)  "The prosecution therefore does not need to show that a waiver of *Miranda* rights was express.  An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence." (*Berghuis*, *supra*, at p. 384.) "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." (*Berghuis*, *supra*, at p. 384.)

Furthermore, *Miranda* rights can be invoked at any time, affording a suspect "the opportunity to reassess his or her immediate and long-term interests" and any decision to invoke or waive rights with respect to police interrogation.  (*Berghuis*, *supra*, 560 U.S. at p. 388.)  A defendant's "course of conduct" during the interaction is relevant to the question whether an express or implied waiver of the right to remain silent has been established.  (*Id.* at pp. 386, 388.)

## B.  Factual Background Applicable to McDaniel's *Miranda* Claim

It is undisputed that McDaniel was under arrest and in custody at the time of his interrogation, triggering the application of *Miranda*'s prophylactic protections.[6]  The

---

[6]     "Custody" means "a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." (*California v. Beheler* (1983) 463 U.S. 1121,

14

question before us is whether the prosecution established that McDaniel knowingly and voluntarily waived his privilege against self-incrimination for purposes of the actual interrogation conducted by Detective Andriese.[7] If so, McDaniel's subsequent statements would be admissible in the prosecution's case-in-chief.

The interaction between Andriese and McDaniel proceeded as follows:

"[ANDRIESE]: Hi David. Hang on just a second.

"MCDANIEL: *One question respectfully, and you can just cut to the chase, am I under arrest? If that's the case, then we don't have nothing to talk about.*

"[ANDRIESE]: You have nothing to talk about?

"MCDANIEL: No. What do you want? What are – what's…

"[ANDRIESE]: You – your name has come up in an investigation for a robbery.

"MCDANIEL: How did my name come up?

"[ANDRIESE]: So with that, yes you are under arrest for robbery. Having said that, you have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. Do you understand the rights I've read to you? Having those rights in mind, do you wish to talk to me further?

"MCDANIEL: *What is going on?*

---

1125; *Oregon v. Mathiason* (1977) 429 U.S. 492, 495; *Green v. Superior Court* (1985) 40 Cal.3d 126, 135.)

[7] "[T]he term 'interrogation' under *Miranda* refers … to express questioning" and "to any words or actions on the part of the police … that the police should know are reasonably likely to elicit an incriminating response." (*Innis*, *supra*, 446 U.S. at p. 301.)

15

"[ANDRIESE]:     Well like I said your name has come up in an investigation in a ro – in, um, a series of robberies, okay?

"MCDANIEL:      *So I – I'm under arrest for my name coming up?*

"[ANDRIESE]:     Yeah.

"MCDANIEL:      *For my name coming up?  For someone mentioning my name, I'm under arrest?*

"[ANDRIESE]:     *You're under arrest because we've done an investigation, about possibly it's you.  Can you tell me about these?*

"MCDANIEL:      Wait, what did you just say?

"[ANDRIESE]:     Can you tell me about the robberies?

"MCDANIEL:      Positively if it's me?

"[ANDRIESE]:     We've determined that you were responsible in the robberies.

"MCDANIEL:      How the hell you determine that?

"[ANDRIESE]:     We'll discuss that in a little bit.  Can you tell me about them?

"MCDANIEL:      Tell you about what?

[ANDRIESE]:      The robberies.

MCDANIEL:       What?  Dude I'm sitting here broke as fuck, barely fuckin' making it.  You think I would fuckin' fo – what – what – where's the money, what?  That's crazy.  How did my name come up?  Was it the fact I'm a black man, a big black man?[8]

[ANDRIESE]:      You think that's why we picked you out 'cause you're a black man?

---

**8**     In the unredacted recording, McDaniel also asked whether he was under investigation for the robberies because of his "history," indicating he had previously "served time for robbery."

16

MCDANIEL:          A big black man?

[ANDRIESE]:          Why would it be a big black man?

MCDANIEL:          Look everybody reads the papers man.

[ANDRIESE]:          Okay.  You're talking about the papers?

MCDANIEL:          Everybody reads the Irrigator."  (Italics added.)

The interrogation continued in a similar vein.  McDaniel insisted he had no other knowledge of the robberies:  "I don't know anything about the particulars of any fuckin' robberies."  He observed:  "This is a small town.  People talk out here."  He added:  "I don't know shit.  I sh- I know what I seen in the paper, what people say."

When Andriese explained the charges, McDaniel said:  "This is very serious."  He insisted:  "Dude I ain't did shit."  He expressed concern that the robberies would be pinned on him, adding "[s]ometimes that shit happens and it doesn't hold up."  He noted: "[W]hat you're talking about is gonna cost me the rest of my fuckin' life."[9]  At various times he said, "This is insane," and "This is crazy."

When Andriese pressed McDaniel to tell him about the robberies, McDaniel said: "Listen, you know like I know anything you say can and will be used [against] you in a court of law and it's highly likely that it will be used against me whatever I say that indicates that I was a participant in any of this shit.  I could sit here and spill my guts to you.  What – what – what is that gonna do [for] me, except it's gonna slap me in the face. What?  Why?"  He added:  "If your evidence is indicative of my guilt as you say it is, what – why are – well then what the fuck do [you need me for]?"  He continued:  "Dude, I called you and I told you … where I was at man.  I told [the authorities] where I was.  I wasn't trying to fucking hide."

---

**9**        In the unredacted recording, McDaniel said:  "My life is over.  My life is over.  If thi – it's over.  It's over.  Just based on my history, dude, (unintelligible) it's over."

17

McDaniel noted: "I'm aware I'm under investigation. I'm gonna get charged. I'm aware now." He observed: "You're trying to elicit a confession." He said: "I'm going to do life for some bullshit. You'll never get that outta me. I'd rather die. Seriously I've been to hell. I've been there." He added: "You're telling me I'm guilty no matter what right now. That's what you're saying."

McDaniel asked Andriese: "Any of these robberies, was anybody hurt? Was there a gun?" He added: "Seriously bro. Seriously. I don't – I'm not a hard – I'm not a hardcore motherfucker. I don't shoot. I don't do none of that shit." He observed: "The way you come at me was like fuckin' I was a dead ca- closed case[,] like all I [was] need[ed] for [was an] admission. On a sly."

Eventually Andriese inquired: "You need anything else? You wanna think about this a little bit?" McDaniel responded: "What is there to think about other than taking me to jail? What is there to think about? If you're taking me, let's just go out … we'll just go from there brother. I have to go, let's just go, seriously." Andriese offered McDaniel a drink of water to calm him down. McDaniel replied: "I don't want a drink of water. If I'm going to jail, just please take me."

As stated above, the prosecution played a video-recording of McDaniel's interrogation for the jury. In closing argument, the prosecutor argued that McDaniel's statements amounted to "adoptive admissions that he committed the robberies."

## C. Analysis

McDaniel argues he invoked his right to remain silent at the very beginning of the exchange with Andriese, by stating: "[A]m I under arrest? If that's the case, then we don't have nothing to talk about." (See *Berghuis*, *supra*, 560 U.S. at pp. 381-382 ["an accused who wants to invoke his or her right to remain silent" must do so affirmatively and unambiguously].) He contends that any further interrogation was therefore prohibited under *Miranda*, necessitating the exclusion of all his subsequent statements.

18

We disagree. Even assuming McDaniel invoked his right to remain silent when he said, "[A]m I under arrest? If that's the case, then we don't have nothing to talk about," his later interrogation statements were not obtained in violation of *Miranda*.

When McDaniel made the above-referenced statement to the effect there was nothing to talk about, Andriese did not respond by interrogating or questioning him about the facts of the crimes under investigation. Rather, Andriese informed McDaniel that he was indeed under arrest for robbery and proceeded to give him, for the first time, the full set of *Miranda* warnings. Andriese then asked whether McDaniel understood those rights; in the video of this interaction, McDaniel appeared to nod at this point. Andriese further asked whether, in light of McDaniel's *Miranda* rights, McDaniel wanted to talk to Andriese. In response, McDaniel directed a series of questions at Andriese: "What is going on?"; "So I – I'm under arrest for my name coming up?"; and "For my name coming up? For someone mentioning my name, I'm under arrest?"

The fact that McDaniel engaged with Andriese by asking him questions about the case amounted to an implied waiver of the right to remain silent that he had arguably earlier invoked. At the same time, "[t]here is no basis in this case to conclude that [McDaniel] did not understand his rights" or that he was coerced to talk to Andriese. (*Berghuis*, *supra*, 560 U.S. at p. 385.) McDaniel's waiver was therefore valid. (*Id.* at pp. 385-387 ["As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford."].)

Indeed, it was only *after* McDaniel demonstrated a willingness to talk to Andriese (and thereby impliedly waived his right to remain silent) that Andriese first asked a question that may properly be construed as *interrogation* for purposes of *Miranda*. (See *Innis*, *supra*, 446 U.S. at p. 301 ["*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."].)

19

Specifically, Andriese commenced the interrogation when he said: "You're under arrest because we've done an investigation, about possibly it's you. *Can you tell me about these [robberies]?*" (Italics added.) Since Andriese employed express questioning or its functional equivalent for purposes of eliciting incriminating responses once McDaniel had validly waived his (arguably) previously-invoked right to remain silent, there was no *Miranda* violation. Nor did McDaniel make any potentially incriminating statements until after he was advised of his *Miranda* rights and had validly waived them.

In short, McDaniel's custodial interrogation comported with the requirements of *Miranda* and his responses, in turn, were admissible in the prosecution's case-in-chief.

## II.    *Admission of Text Exchange Between McDaniel and his Mother*

### A.    Background

The prosecutor sought to admit a September 10, 2014 text message exchange between a cell phone associated with McDaniel and a cell phone associated with McDaniel's mother. The exchange was as follows (abbreviations, spelling, and punctuation as in original):

"[McDaniel]:        *Stop telling lies!!!*

"[McDaniel]:        That's why Johnny left yo nasty ass..

"[Mother]:        U r the 1 who needs to learn how 2 respect. I am ur mother and *ur days r number*

"[McDaniel]:        Why are you so hateful

"[Mother]:        *An that is why u will b locked up 4 robberey of the stores in this area*

"[Mother]:        Why do you feel u hv 2 b so nasty an fowl ur sick" (Italics added.)

The prosecution filed a motion in limine to admit the text exchange between McDaniel and his mother, with a focus on the mother's statement to the effect, "An that is why u will b locked up 4 robberey [*sic*] of the stores in this area." Indeed, this

20

statement is the reason why this text exchange was relevant, in the first place, to the disputed issue at trial, i.e., whether McDaniel was the perpetrator of all the charged robberies.

The prosecution, in its motion in limine, argued: "[McDaniel's] failure to respond to his mother['s] last text message where she accused him of committing the robberies in the area is admissible as an adoptive admission by [McDaniel] that he committed these robberies."

McDaniel filed a motion in limine to exclude the text exchange on several grounds, rejecting the People's proffered basis for admission. He argued that under the applicable circumstances, his failure to text his mother back did not reasonably constitute an adoptive admission by him that he had committed the robberies referenced by his mother. He further argued that "there is no foundation that [the mother] has personal knowledge to make such a statement," rendering her statement merely "an improper opinion."

At trial, a record from McDaniel's cellular carrier documenting the fact of the text exchange, as well as the content of the text messages, was admitted into evidence. The court in turn instructed the jury on adoptive admissions pursuant to CALCRIM No. 357. Subsequently, in closing argument, the prosecutor forcefully argued, with reference to the record of the text exchange, the content of the mother's text message, and the jury instruction on adoptive admissions, that McDaniel had failed to respond to his mother's statement and this failure amounted to an "adoptive admission" on his part that he had in fact robbed stores in the local area.

On appeal, McDaniel argues that admission of the text exchange to show an adoptive admission on his part was error. We agree.

21

## B. Analysis

"Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid. Code, § 1221.) Thus, " ' "[w]hen a person makes a statement in the presence of a party to an action under circumstances that would normally call for a response if the statement were untrue, the statement is admissible for the limited purpose of showing the party's reaction to it. [Citations.] His silence, evasion, or equivocation may be considered as a tacit admission of the statements made in his presence." ' " (*Jennings, supra,* 50 Cal.4th at p. 661.) The proponent must establish the statement was made under circumstances that would normally call for a response if the statement were untrue. (*People v. Riel* (2000) 22 Cal.4th 1153, 1189.) Consequently, the "adoptive admission" exception to the hearsay rule generally applies to accusatory statements but can apply even if a "direct accusation in so many words" is not made. (*People v. Fauber* (1992) 2 Cal.4th 792, 852.)

*People v. Wilson* (1965) 238 Cal.App.2d 447 provides a useful summary of "the general rules as to the use of accusatory statements," in this context:

> " 'Accusatory statements … are plain hearsay. They may properly find their way into the record only as admissions, under the familiar exception to the hearsay rule. If the accused responds to the statement with a flat denial, there is no admission and hence nothing that may be received in evidence. If, on the contrary, the truth of the statement is admitted, the statement may properly be introduced. A third situation is presented when the accused stands mute in the face of the accusation or responds with an evasive or equivocal reply. In that situation this court has held that *under certain circumstances* both the statement and the fact of the accused's failure to deny are admissible on a criminal trial as evidence of the acquiescence of the accused in the truth of the statement or as indicative of a consciousness of guilt.
>
> " 'The theory underlying this rule is that the natural reaction of an innocent man to an untrue accusation is to enter a prompt denial. Where

his response is silence, evasion, or equivocation, it is for the trial court to determine in the first instance whether the accusation has been made under circumstances calling for a reply, whether the accused understood the statement, and whether his conduct or response was such as to give rise to an inference of acquiescence or guilty consciousness. Where the trial judge determines that such an inference may be drawn, the statement is then admitted, not as substantive evidence in proof of the fact asserted but merely as a basis for showing the reaction of the accused to it.' " (*Wilson, supra,* 238 Cal.App.2d at p. 457.)

Here the prosecution's theory that the mother's statement was admissible to show an adoptive admission by McDaniel was based on the fact that McDaniel did not text his mother back to deny her indirect accusation that he had committed several local robberies. However, given the nature of text messaging, the fact that McDaniel did not text his mother back was not sufficient to show that he had adopted his mother's statement. Text messaging is different from in person and phone conversations in that text exchanges are not always instantaneous and do not necessarily occur in "real time." Rather, text messages may not be read immediately upon receipt and the recipient may not timely respond to a text message for any number of reasons, such as distraction, interruption, or the press of business. Furthermore, people exchanging text messages can typically switch, relatively quickly and seamlessly, to other forms of communication, such as a phone call, social-media messaging, or an in-person discussion, depending on the circumstances. In short, in light of the distinctive nature of text messaging, the receipt of a text message does not automatically signify prompt knowledge of its contents by the recipient, and furthermore, the lack of a *text* response by the recipient does not preclude the possibility that the recipient responded by other means, such as a phone call.

The text exchange at issue here was not instantaneous but rather unfolded over a 20-minute period until it stopped. There was no evidence as to whether and when McDaniel read the text message in which his mother suggested he had robbed multiple local stores. To the extent he read it, it was entirely possible he responded to it by calling his mother or talking to her in person. Considering the distinctive nature of text

23

messaging, the instant record provides *no basis* for a conclusion, in the first instance, that McDaniel, with knowledge of his mother's statement, in fact *failed to deny or respond* to it and, in turn, that he thereby adopted it. (See *People v. Maki* (1985) 39 Cal.3d 707, 712 ["'To prove 'adoption' of a hearsay statement sufficient to make it admissible under [Evidence Code] section 1221, … it must be shown 'that the party to an action against whom a declarant's hearsay statement is offered as an adoptive admission, (1) had *knowledge* of the contents of *declarant's* statement, and (2) having such knowledge, has, *by words* or *other conduct*, manifested his adoption or his belief in its truth.' "].)

Furthermore, the text exchange at issue captured a heated argument between McDaniel and his mother in which McDaniel had emphatically texted his mother, "Stop telling lies!!!" Given that McDaniel had angrily demanded that his mother "[s]top telling lies," the prosecution could not reasonably establish that a putative failure to contradict his mother's subsequent text to the effect that he would "b locked up 4 robberey [*sic*] of the stores in this area" constituted an *admission by him* that he had committed the robberies she referenced.[10] Indeed, to the extent his mother's texts were based on newspaper articles or police flyers about the robberies, any failure to respond may well have reflected McDaniel's frustration with his mother, rather than an admission of guilt as to the commission of the robberies.

In sum, here there was not an adequate showing that McDaniel had in fact failed to respond to or deny his mother's indirect accusation. Second, a response or denial was not necessarily warranted under the circumstances. Finally, there was no other evidence of McDaniel's reaction to his mother's statement that showed adoption of it on his part.

---

[10]    As noted above, the police had publicized the robberies by disseminating flyers and the local newspaper had published an article describing the robberies as well. The details of the robberies as well as images of the robber (the images were derived from video footage collected from the affected establishments) were therefore publicly known.

24

(See *People v. Chism* (2014) 58 Cal.4th 1266, 1297 [defendant's mere possession of letter accusing him of committing a crime did not render letter admissible to show adoptive admission on his part to the effect that he committed the crime, where he did not read the letter in the accuser's presence and there was no evidence of his reaction to it]; *People v. Lewis* (2008) 43 Cal.4th 415, 498 [defendant's mere possession of incriminatory drawings, without more, did not constitute an adoption of the message reflected in the drawings, which were therefore not admissible to show adoptive admission on his part], overruled on other grounds by *People v. Black* (2014) 58 Cal.4th 912.)

We therefore conclude the prosecution could not reasonably show that McDaniel failed to respond to his mother's assertion and thereby adopted it and admitted to committing multiple local robberies. In turn, it was error to admit the text exchange to show an adoptive admission on McDaniel's part that he committed the robberies referenced by his mother.

### C.    The Issue was Properly Preserved for Review

The People argue that, rather than obtaining a ruling from the court, the parties had agreed to mutually resolve the question of the admissibility of the text messages. The People further contend that a subsequent stipulation by the parties to the effect that a record from McDaniel's cellular carrier documenting the text exchange was authentic and admissible as a business record of the carrier, precludes McDaniel from challenging the admission of the text exchange on appeal. We disagree with these contentions.

The record of the proceedings in the trial court indicates that, ahead of the hearing on in limine motions, the parties and the court discussed, in chambers, the admissibility of the text exchange between McDaniel and his mother. Although this discussion was not reported, the subsequent discussion regarding the issue at the hearing on in limine motions was reported. At the in limine motions hearing, the court did not directly

address the admissibility of the mother's statement to show an adoptive admission on McDaniel's part but rather focused on a residual issue, that is, how much of the rest of the text exchange to include as context for the mother's operative statement. The court directed the parties to work together to resolve this residual issue, noting that were they to fail, it would step in to do so. Defense counsel verbally iterated, for purposes of making a complete record, that he was objecting in the first instance to admission of the content of the mother's text message to show an adoptive admission, on McDaniel's part, to the effect that he had committed multiple local robberies. The court permitted counsel to make a record to preserve his objection to admission of the mother's statement to show an adoptive admission by McDaniel. Thereafter, counsel did not further object on this basis, indicating he viewed additional objections to be futile.

Subsequently, defense counsel stipulated that a record from McDaniel's cellular carrier reflecting the text exchange between McDaniel and his mother was admissible as an authentic business record. There was no stipulation to the effect that the content of the mother's statement was admissible to show an adoptive admission by McDaniel that he had committed several local robberies.

Here, key parts of the discussion regarding the admission of the text exchange appear to have occurred in chambers and were unreported. Considering this fact, as well as the discussions that were reported, we conclude the most reasonable interpretation of the proceedings is that the court had informed the parties it was ruling in the prosecution's favor, i.e., that the operative exchange (the mother's statement and the lack of a responsive text from McDaniel) was admissible to show an adoptive admission by McDaniel. At the same time, the court directed the parties to work together to resolve how much of the rest of the text exchange to include as context for the operative part.

Our conclusion that the court had effectively ruled that the content of the mother's text message was admissible to show an adoptive admission by McDaniel is supported by

26

the fact that defense counsel reiterated his objection to such a ruling, for purposes of clarification of the record, when directed by the court to work with the prosecutor for the limited purpose of identifying how much of the rest of the exchange to include as context for the mother's statement. Furthermore, the fact that the record does not include a stipulation to the effect that the content of the mother's statement was admissible to show an adoptive admission by McDaniel indicates this issue was resolved by a court ruling (not a stipulation). Indeed, defense counsel's eventual stipulation that the record documenting the text exchange, obtained from McDaniel's cellular carrier, was authentic and admissible as a business record of the cellular carrier, *presupposes* a ruling that the content of the mother's text message was admissible in the first instance. Without such a ruling, the cellular carrier's record would be irrelevant and inconsequential.

The People contend, however, that defense counsel's stipulation to the effect that the cellular carrier's record reflecting the text exchange was admissible as a business record, precludes him from challenging admission of the content of the mother's statement to show an adoptive admission by McDaniel. This contention lacks merit.

As stated above, defense counsel only stipulated to admission of the cellular carrier's record under the business record exception. This stipulation renders admissible just the fact of the text exchange, not the content of the mother's text messages. More specifically, since the declarant of the relevant message was McDaniel's mother and *she* did *not* have a *business duty* to make the statements at issue, the substance of her statements is not covered by the business record exception. (See *MacLean v. City & County of San Francisco* (1957) 151 Cal.App.2d 133, 143 [business record exception to hearsay rule is premised on principle that hearsay statements recorded as part of routine business duty are deemed trustworthy and hence are admissible under the exception]; *Hoel v. City of Los Angeles* (1955) 136 Cal.App.2d 295, 309 [business record exception does not make admissible statements that would constitute hearsay upon oral testimony

27

of business representative]; *Harris v. Alcoholic Bev. Con. Appeals Bd.* (1963) 212 Cal.App.2d 106, 109 [arrest records are admissible to show *the fact* of an arrest but hearsay narrations included in police records are inadmissible].) In short, the parties' stipulation that the cellular carrier's record of the text exchange was an authentic business record was not the basis of admission of the content of the mother's text messages.

Rather, it reasonably appears that the content of the text messages was admitted on the basis of a prior court ruling admitting the content to show an adoptive admission on McDaniel's part. (See Evid. Code, § 1221.) Indeed, the court instructed the jury accordingly and the prosecution, in closing, argued that the text messages showed an adoptive admission by McDaniel. Defense counsel repeatedly objected to admission of the content of the mother's text message to show an adoptive admission by McDaniel. In light of defense counsel's specific objections, it cannot reasonably be inferred that he stipulated to admission of the *content* of the mother's text message. We therefore conclude counsel properly preserved the issue for review.

### D. Conclusion

Since we have concluded that admission of the text messages to show an adoptive admission by McDaniel that he had robbed local stores was error, we must next consider whether the error was prejudicial. The People do not dispute McDaniel's further contention that evidence of the text exchange was also prejudicial. Nonetheless, we will more fully address the question of prejudice on account of this evidence in section IV of this opinion, *post*.

### III. *Admission of Book (The Paper Trip III) and Notes Found in McDaniel's Car*

The prosecution sought to admit a large sheaf of reading material that was found in McDaniel's car on October 31, 2014. The reading material consisted of (1) a photocopy of a book or manual called The Paper Trip III; (2) a handwritten table of contents for this book or manual; (3) a book catalog; (4) and a handwritten booklist.

28

The prosecution filed a motion in limine seeking admission of these materials. The prosecution argued in the motion: "These documents are material and relevant to further show [McDaniel's] state of mind—his intention to avoid detection and apprehension for the commission of these robberies." Defense counsel objected to admission of the documents on the grounds proffered by the prosecution.[11] The court ruled the documents were admissible for the purpose proffered by the prosecution. The court noted the documents were "apparently found in [McDaniel's] vehicle" and, to the extent they did not belong to McDaniel, their relevance could be questioned in closing arguments.

We conclude the court erred in admitting the materials, including the copy of The Paper Trip III, the handwritten table of contents, the book catalog, and the handwritten booklist.

## A. Background

The introduction to The Paper Trip III explained that it was part of a book series. The series addressed topics such as methods to " 'disappear' from a troubling past and 'reappear' with a new identity based on government-issued ID." The introduction noted that the books had helped " '[e]x-cons' … to build new lives free of damaging records." The Paper Trip III itself addressed dubious and potentially illegal methods of obtaining or creating "alternate ID" and developing a new identity. It contained chapters with titles such as "Fingerprints & Criminal Records," and "Make Your Own ID."

As for the book catalog found with The Paper Trip III, it listed books with titles such as "How to Clear Your Criminal Record" and "Clean State: The New Laws." These books were checked off on the catalog, presumably reflecting the owner's interest in acquiring them. Finally, the handwritten booklist encompassed a long list of dubious-sounding books, including "How to Clear Your Criminal Record"; "Criminal Records

---

[11] Subsequently, defense counsel further objected on hearsay grounds.

29

Manual"; "Have You Been Or Are You in the FBI Files"; "Reborn Overseas"; "100 Ways to Disappear"; and "The ID Forger."

## B.    Analysis

In light of the relevant circumstances, the book and documents proffered by the People had little or no relevance to the disputed issue at trial, i.e., the identity of the person who perpetrated each of the charged robberies.  First, there was no evidence as to *when* McDaniel acquired the copy of the book, The Paper Trip III, and the related documents.  Furthermore, McDaniel had two prior convictions, had served time in prison, and was on parole.  Finally, there was no evidence showing that McDaniel had taken any affirmative steps to "disappear" so as to avoid apprehension for the instant crimes.  Given that McDaniel had a prior criminal record, along with the lack of any evidence showing when he acquired the photocopied book as well as the lack of any evidence showing he had taken steps to "disappear" after committing the instant robberies, the challenged materials cannot reasonably be said to reflect a state of mind, on his part, of actively trying to avoid apprehension for committing the charged robberies.  Rather, since the materials related to methods of erasing an *existing* criminal record, which McDaniel had, it appears more reasonable that he acquired the book and book catalogs because of concerns about his preexisting criminal record.  The relevance of these materials to the identity of the perpetrator of the instant robberies is therefore tangential at best.

At the same time, admission of the book and related materials created a definite danger of undue prejudice, in that the references to "[e]x-cons" and the burdens of a criminal record could reasonably lead the jury to infer that McDaniel had a prior criminal record and was a person of bad character.  (See *People v. Jackson* (2016) 1 Cal.5th 269, 300 (*Jackson*) ["[Character evidence] is said to weigh too much with the jury[,] and to so overpersuade them is to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge."].)  Thus, this evidence did little more

30

than imprint an image of McDaniel, in the eyes of the jury, as a dubious character at best and a serial criminal at worst.

We conclude the court abused its discretion in granting the prosecution's motion in limine to admit this evidence to show "[McDaniel's] state of mind—his intention to avoid detection and apprehension for the commission of these robberies." Even were this evidence relevant for the purpose identified by the prosecution, it should have been excluded under Evidence Code section 352 as it was far more prejudicial than probative. Nor was there any valid basis to admit this evidence under Evidence Code section 1101, subdivision (b). Evidence Code section 1101, subdivision (b) permits the admission of evidence of prior bad acts to show something other than criminal disposition. The statutory inquiry turns on degrees of "similarity" between the prior bad acts and the charged offenses. (See, e.g., *Jackson*, *supra*, 1 Cal.5th at p. 300.) Since there was no "similarity" between McDaniel's possession of the documentary materials and the charged robberies, Evidence Code section 1101, subdivision (b) did not apply. In short, the court erred in admitting these materials.[12]

The People do not dispute McDaniel's further contention that admission of this evidence was prejudicial. Nonetheless, we next evaluate whether the erroneous admission of this evidence—i.e., The Paper Trip III, the handwritten table of contents for it, the book catalog with various titles checked off, and the handwritten booklist—was prejudicial.

---

[12]    We have determined that defense counsel's objection to the prosecution's motion in limine properly preserved this issue for review. The People argue the issue was not preserved for review because McDaniel did not object on the basis of Evidence Code section 1101. This argument is unavailing because, as explained above, Evidence Code section 1101 was inapplicable to begin with and, in any event, the evidence was not proffered under that section.

***IV.***     ***Prejudice from Erroneous Admission of Text Exchange and The Paper Trip III***

McDaniel contends the erroneous admission of his mother's text messages to the effect that his "days [were] number[ed]" because he would be "locked up" for robberies of "the stores" in the "[local] area," was prejudicial. He further contends the erroneous admission of The Paper Trip III, the table of contents, the book catalog, and the handwritten booklist, was also prejudicial. The People do not assert otherwise, contesting McDaniel's claims of error alone.

Evidentiary errors under state evidence rules are evaluated under the "reasonable probability" standard of prejudice announced in *People v. Watson* (1956) 46 Cal.2d 818. (See, e.g., *People v. Fudge* (1994) 7 Cal.4th 1075, 1103.) We conclude the errors detailed above were prejudicial under this standard. In other words, considering the record as a whole, there is a reasonable chance that had the complained-of evidence been excluded, the result of the proceeding would have been more favorable to McDaniel. (*People v. Soojian* (2010) 190 Cal.App.4th 491, 521 [indicating that, for purposes of *Watson* standard, "a hung jury is a more favorable result than a guilty verdict," and, in turn, that the standard is met when there is a reasonable chance the absence of error would change a single juror's mind].)

Here, the case against McDaniel was entirely circumstantial. In assessing prejudice from the above-described errors, we will first summarize relevant aspects of the case against McDaniel. The witnesses to the robberies for the most part described the respective suspect as a tall (the descriptions of the respective suspect ranged from five feet 11 inches to six feet six inches), heavy (the descriptions ranged from 200 to 300 pounds), Black or "Hispanic" (the descriptions ranged from "light-skinned black" to "dark Hispanic") man. None of the witnesses identified McDaniel as the robber. The witnesses to the robbery at the MetroPCS store testified that the robber had a scruffy beard and was wearing a straw fedora pulled down to the bridge of his nose. Although

there was no evidence the robber's face was otherwise obscured, the witnesses still did not identify McDaniel as the robber. The descriptions given by witnesses to the various robberies did little to narrow the pool of potential suspects, especially when none of the witnesses identified McDaniel as the robber. There was also evidence that police were tipped off about another tall, heavy, Black man in relation to the robberies (this suspect was arrested for burglarizing a Walmart around the time of McDaniel's arrest).

The prosecutor argued, based on surveillance video clips obtained from the affected businesses, that a jacket, various shoes, and a black do-rag found in McDaniel's apartment matched items worn by the robber in a couple of the charged robberies. However, this theory was not particularly persuasive as the videos and corresponding still photographs in evidence do not show the robber's clothing and shoes with any particularity, thereby undermining the ability to compare them to items collected from McDaniel's apartment. In addition, the prosecutor acknowledged the existence of color distortions in the video evidence, further undermining the probative value of such comparisons. Nor was any evidence adduced to verify the accuracy of the color depictions in the videos.

To give an example to illustrate this point, Detective Andriese testified at the preliminary hearing, with reference to video footage of the Subway incident, that the robber's shoes matched a pair of brown work boots found in McDaniel's closet. At trial, Andriese made an about turn and suggested the shoes worn by the Subway robber matched a pair of gray sneakers found in McDaniel's closet. Andriese's contradictory testimony goes to show the videos were not distinct enough to enable reliable comparisons of items worn by the robber in the respective, relevant incidents with items found in McDaniel's apartment.

Finally, the clothing and shoes collected from McDaniel's apartment were commonly worn items that were not particularly distinctive. The jacket and shoes worn

33

by the robber, as reflected in the relevant videos, were also generic looking. This fact further undercut the probative value of the comparisons the People attempted to make between items worn by the robber in a couple of incidents and items collected from McDaniel's apartment.

As for McDaniel's police interrogation, it too was not particularly probative. While McDaniel made some incriminating statements, he mostly expressed concerns that the robberies were being incorrectly pinned on him. He did not confess and denied committing the robberies. He suggested the authorities were focused on him because he was a big, Black man, with a general resemblance to the robbery suspects depicted in surveillance video images as published in the community newspaper.[13] Furthermore, to the extent some of McDaniel's statements may be interpreted as a failure to emphatically deny guilt, those responses would be consistent with committing any *one* of the robberies and not necessarily guilt as to *all* the charged robberies.

On another note, a black left-hand glove was found in McDaniel's car after his arrest and video footage of the Subway robbery showed the robber wearing a dark glove on his left hand. Also, McDaniel owned a white SUV and, on the day of the Westley Subway robbery, a surveillance camera at a nearby motel captured a white SUV driving in the area. However, this evidence was relevant only to the Subway robbery (the Subway shop was located in Westley, 10 miles away from Patterson, and the robbery there occurred in October 2014, two months after the last robbery in Patterson). In addition, this evidence cannot be said to be overwhelming.

The circumstantial nature of the prosecution's case against McDaniel heightened the importance of the erroneously-admitted evidence. The erroneously-admitted evidence was also particularly damaging because it was purportedly relevant to all the

---

[13]     The unredacted version of the interrogation showed that McDaniel also expressed a concern that the robberies would be pinned on him because of his history.

charged counts and the fact of the existence of multiple counts itself bolstered the case as to each individual count.

Turning specifically to the erroneously-admitted text exchange, this evidence was highly probative, indeed explosive. It captured the unfiltered views of McDaniel's *own mother*, who would reasonably be expected to have seen the flyers and articles about the robberies, which included images of the suspects in the respective robberies. The text exchange flagged for the jury that McDaniel's own mother believed he was the person committing the robberies in the local area.

In addition, the text exchange was specifically introduced to show McDaniel *admitted* to robbing several local stores (the jury was instructed on adoptive admissions). Thus, the erroneously-admitted text exchange not only revealed that McDaniel's own mother believed he had robbed the local stores, but also permitted the jury to infer, based on McDaniel's failure to respond to his mother's assertions, that *McDaniel admitted he had robbed the stores*.

Finally, the prosecutor understood the unique power of this evidence and devoted considerable attention to the text messages in her closing argument. The prosecutor's use of the text exchange in closing argument rendered it singularly damning evidence against McDaniel. The prosecutor showed a color chart depicting the text messages to the jury. She argued: "Now let's talk about the text, the text message. … [¶] So we're focused on a September 10, 2014, text message exchange between the cell phone numbers associated with [McDaniel] and his mother. [¶] Particularly of interest is her statement coming from her cell to his cell phone, 'That's why you will be locked up for the robbery of the stores in this area.' [¶] … [¶] Look at mom's text message. I'll show it to you. [McDaniel's] phone stops responding to his mother's texts after she texts him that his days are numbered and that he will be arrested for the robberies in the area. [¶] There's no more response from him once she types that. [¶] … [¶] You saw the complete text

[ex]change between the devices associated with [McDaniel] and his mother. [McDaniel's] device simply doesn't respond to her statement about the robberies."

The prosecutor then referenced the jury instruction on adoptive admissions given by the judge. She methodically walked the jury through the instruction, explaining that upon finding the requirements set forth in the instruction were met, the jury was permitted to conclude "that [McDaniel] admitted the statement was true." The prosecutor concluded: "It's our position that all of these requirements were met *and that [McDaniel] admitted that he committed the robberies*. [¶] The lack of a response from [McDaniel's] phone to the texts from [his] mom's phone that he will be arrested for the robberies *is an adoptive admission that he committed the robberies*." (Italics added.) Thus, harnessing the instruction on adoptive admissions, the prosecutor was able to argue that McDaniel had effectively confessed to committing the robberies. In doing so, she lobbed into the case " ' "[the] kind of evidentiary bombshell [that] shatters the defense." ' "[14] (*People v. Neal* (2003) 31 Cal.4th 63, 86; *People v. Cahill* (1993) 5 Cal.4th 478, 503.)

The prejudice from the erroneous admission of the text exchange was compounded by the prejudice arising from the erroneously-admitted photocopied book and related documents found in McDaniel's car. These materials detailed potentially illegal methods for obtaining a new identity and also reasonably led to an inference that McDaniel had a prior criminal record. In light of the erroneously-admitted evidence of The Paper Trip III and the handwritten and hand-marked booklists and catalogs, along with the prosecutor's emphatic references in closing argument to the text sent by

---

**14** The actual text message sent by McDaniel's mother stated: "An that is why u will b locked up *again* 4 robberey [*sic*] of the stores in this area"; however, the word "again" was redacted from the text exchange when it was admitted into evidence. (Italics added.) Accordingly, McDaniel's arguments regarding prejudice emanating from the word "again" as used in the text message, are misplaced.

36

McDaniel's mother in which she accused him of committing the robberies in the local area, the jury could be expected to infer not only that McDaniel's mother believed he had committed the robberies and McDaniel had admitted to doing so, but also that McDaniel had a criminal past and was committing or exploring identity fraud.  (See *People v. Thompson* (1980) 27 Cal.3d 303, 314 ["The admission of any evidence that involves crimes other than those for which a defendant is being tried has a highly inflammatory and prejudicial effect on the trier of fact."].)

Finally, the record reveals that the jury found the case to be a close one and struggled to reach guilty verdicts on all counts.  Closing arguments in the case were wrapped up on Monday, March 6, 2017.  The trial resumed on Wednesday, March 8, 2017, when the jury was instructed and then deliberated for the rest of the day.  The jury asked for a DVD player and readback of witness statements.  The jury returned on Friday, March 10, 2017, and again deliberated all day.

At 11:16 a.m., on Friday, March 10, 2017, the foreperson sent the judge a note.  The note stated:  "We are 10-2 on 4 counts.  What happens if we are not unanimous on these counts[?]"  The judge informed the jurors:  "[Y]our verdict on each count must be unanimous."  The judge also directed the jurors to CALCRIM No. 3550.  This instruction, as given to the jury, provided:  "Your verdict on each count must be unanimous.  This means that, to return a verdict, all of you must agree to it."

On the following Monday, March 13, 2017, the jury returned verdicts on all counts.  The jury found McDaniel guilty on all counts except count 6, in which he was charged with robbery of the MetroPCS store.  McDaniel was acquitted of the robbery of the MetroPCS store.  The fact that the jury acquitted McDaniel of the robbery of the MetroPCS store and had reached an impasse on at least four counts until pushed by the judge to reach unanimous verdicts, suggests the jury was open to the idea that someone else was also committing robberies in the area at the same time.  Given this context, as

well as the fact that the case against McDaniel was circumstantial and far from overwhelming, there is a reasonable chance that absent the improperly admitted evidence, at least one juror would have found him not guilty of the other robberies as well.

Accordingly, we conclude that, taken together, the erroneous admission of the text messages and the documents found in McDaniel's car, was prejudicial. Indeed, the erroneous admission of the text messages alone requires reversal. McDaniel's convictions must therefore be reversed. Our disposition makes it unnecessary to address McDaniel's remaining contentions.

## **DISPOSITION**

The judgment is reversed. The matter is remanded for further proceedings consistent with this opinion.

_____

SMITH, J.

WE CONCUR:

_____

FRANSON, Acting P.J.

_____

SNAUFFER, J.