Filed 9/21/22  P. v. Moreno CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>BRANDON MORENO,<br><br>    Defendant and Appellant. | A165850<br><br>(Fresno County<br>Super. Ct. No. F19900558) |

Brandon Moreno (appellant) appeals from his convictions, following a jury trial, for second-degree murder (Pen. Code,[1] § 187) and inflicting corporal injury on a cohabitant (*id.*, § 273.5, subd. (f)(1)).  He argues the trial court erred in allowing inadmissible hearsay at trial.  We agree and reverse.

BACKGROUND

*The Events of January 18 and 19, 2019*

On January 19, 2019, appellant brought his girlfriend, Yanina Elizabeth Olivarez Narez (Olivarez), to the hospital.  Olivarez was nonresponsive with numerous bruises and red marks all over her body, including to her head and face.  She died soon thereafter from blunt force

---

[1] Undesignated statutory references are to the Penal Code.

injuries to her head. A blood sample taken before her death tested negative for alcohol and drugs.

Appellant told police Olivarez seemed fine when he left their apartment about 2 p.m. the previous day. He did not know what her plans were for the rest of the day but thought she would probably go out with a friend. Appellant had been with someone named Alan; appellant told police he did not know Alan's last name or phone number, but a search of appellant's phone showed text messages between them from January 18. Appellant told police he and Alan went to a bar and drank there until about 2 a.m., when they went to someone else's house and continued drinking until appellant fell asleep. In the morning Alan drove appellant home, where he arrived about 9 a.m. Appellant found Olivarez lying in bed with a pool of blood beneath her head, swelling to her eyes and neck, and blood coming from her mouth. When he tried to wake her up, she gave him a blank stare. Appellant thought she had gotten in a fight while out drinking with friends and just needed to sleep it off, so he left her in bed. About an hour later she sounded like she was having trouble breathing and he drove her to the hospital. During his interview with police, appellant kept displaying his hands and saying something like, "I know how it looks, I didn't do anything." The officer did not see injuries to appellant, but a forensic nurse examined appellant that evening and found bruises on the knuckles of both hands and a scratch on a finger of his right hand. Appellant told the nurse the injuries were preexisting. A blood sample taken from appellant on the evening of January 19 was positive for cannabinoids, THC, amphetamine, and cocaine.

Alan Q. testified he picked appellant up at appellant's apartment about 2 p.m. on January 18. They spent the afternoon together and went to a bar in the evening. About 1 a.m. or 2 a.m., they left the bar and went to the home

2

of a woman they had met at the bar, where they drank more. When Alan drove appellant home in the morning, the sun was up or coming up. Alan did not remember appellant getting into any kind of fight or altercation that night. In a police interview on January 23, 2019, Alan gave a similar account.

Martha H. and Cecilia F. lived in the same apartment complex as Olivarez. About 7 p.m. or 8 p.m. on January 18, Olivarez asked Martha if she could use Martha's phone to call her mother and ask about her son. About 9 p.m., Olivarez asked to use Cecilia's phone to call her mother. After midnight, Olivarez asked again to use Martha's phone, saying she was concerned about her boyfriend. Olivarez made two or three calls but no one answered.

Police searched Olivarez's apartment on January 19 and found no signs of forced entry. Blood was spattered and smeared on various walls and surfaces in the apartment, there were mixtures of blood and hair in the toilet and bathtub, and the bedding was "heavily drenched" in blood. A broken pair of Olivarez's glasses with a wad of hair were found on the floor of the bedroom. A picture of appellant, Olivarez, and Olivarez's son was ripped in pieces on top of a dresser. Two bloody t-shirts that appeared to belong to Olivarez were found in dumpsters about 50 feet from the apartment.

*Evidence About Appellant and Olivarez's Relationship*

Thomas T. lived in an apartment about 40 feet away from Olivarez's. He could hear Olivarez and a man arguing loudly in her apartment, and sometimes heard bumping sounds during the arguments. He once saw appellant sternly tell Olivarez to get back inside the apartment; she timidly complied and Thomas heard arguing when they were back inside.

3

Rebekah R. was a manager at a retail store where Olivarez worked. In the summer of 2018, appellant came into the store and sternly asked a male employee, "why are you talking to my girl." Rebekah asked appellant to leave the store. On January 12, 2019, Olivarez asked Rebekah for documentation that she had been late to work. Olivarez seemed scared, and told Rebekah appellant had picked up her son from school and would not give him back unless Olivarez showed appellant a disciplinary write-up. Olivarez also told Rebekah appellant had taken her phone and was going through it. Rebekah printed out Olivarez's time sheet and Olivarez later called to say she had her son.

Bobbie R. testified that in October 2018 Olivarez told her appellant wanted to meet her to ensure she was female. Olivarez told Bobbie appellant was jealous, insecure, and continually questioned her whereabouts. Olivarez said appellant spanked her son when he was 6 or 7 years old, which made Olivarez worry for her son's safety. In late November 2018, Olivarez told Bobbie appellant had gone to San Diego for work for a couple of months. Olivarez seemed relieved when appellant was gone, but also said she wanted him to come back. In the week before she was killed, Olivarez told Bobbie she and appellant had been fighting and Olivarez was upset because appellant had been with another woman and was comparing Olivarez to that woman.

Olivarez's brother testified Olivarez distanced herself from everyone in the months before she was killed. Olivarez's sister testified Olivarez's demeanor changed after she started dating appellant and she seemed nervous all the time.

Marco N., a friend of Olivarez's, testified that twice when they were out together in December 2018, Olivarez received a phone call from her boyfriend

and had to send him a picture to prove where she was. Olivarez told Marco she was sending her boyfriend previously taken photographs so he would not see where she really was because he did not want her leaving the apartment or going out with friends.

Crystal D. testified Olivarez told her appellant was controlling, possessive, and verbally and emotionally abusive. Olivarez told Crystal appellant would check her phone and wanted to know who she was speaking with. Olivarez told Crystal two or three times she feared appellant would physically abuse her son. Olivarez once had Crystal take pictures of bruises on her stomach and arm, which Olivarez said were from appellant.

Chelsea G. testified Olivarez sometimes told her not to text her because appellant had her phone or was looking through it. Olivarez told Chelsea three or four times that appellant had taken her phone. Olivarez once texted Chelsea that she was scared and if anything were to happen to her Chelsea should take care of her son. In early January 2019, Olivarez told Chelsea appellant had recently grabbed her by the hair and pulled her across the apartment in front of her son.

Desmond Y. testified he met Olivarez at a club on December 31, 2018 and was attracted to her. After that night, they texted for a bit until Olivarez told him not to contact her anymore because her boyfriend had returned from out of town and would be upset. Desmond continued to text her, and subsequently received a call from Olivarez's phone. When he answered, a man angrily told Desmond he was Olivarez's boyfriend and Desmond should stop contacting her.

Mable G. testified that on January 10, 2019, Olivarez told Mable she and appellant were always arguing and she did not want her son to see it

5

anymore, so she had left her son with her parents to try and work on her relationship with appellant.

Jeena G. testified that on January 3 and 4, 2019, Olivarez told her appellant did not want to come back from San Diego, but Olivarez wanted him back. On January 14, Olivarez told Jeena, "if I don't call you back in 15 or 30 minutes, call the police." A minute later, Olivarez called back to say she was okay. At some point during the two weeks before she was killed, Olivarez told Jeena that during an argument after appellant went through her cell phone, he pulled her up from the floor by her hair, threw her on the bed, and made her have sex with him. In the week before she was killed, Olivarez told Jeena she was going to leave her son with her mother so she could work things out with appellant.

Christina B. testified that Olivarez said appellant was jealous, would tell her to put her phone on FaceTime so he could see where she was and what she was doing, and told her not to wear low-cut tops. Christina observed that, during Olivarez's relationship with appellant, she grew distant from her family. Around January 14, 2019, Olivarez told Christina that during an argument about what was on Olivarez's phone, appellant pulled her up from the floor by her hair.

Yvonne H. was the property manager at Olivarez's apartment complex. Yvonne testified that in the week before Olivarez was killed, she told Yvonne appellant was mistreating her and she wanted to leave him but she was scared. Yvonne also testified appellant came in a couple of days before Olivarez was killed and asked to be taken off the lease.

Claudia P. worked at a preschool where Olivarez occasionally worked. Claudia testified that on January 18, 2019, Olivarez seemed down and

6

unfocused.  Olivarez asked to use the school phone and Claudia overheard her telling someone she was not going to leave him.  Olivarez seemed scared.

Aurelia C. also worked at the preschool.  She testified that on January 18, Olivarez was unusually sad and quiet.  Olivarez asked to use the school phone and Aurelia overheard her arguing on the phone.  Olivarez told Aurelia things were not the same with her boyfriend and she had tried to leave him, packing up her and her son's belongings, but when they were leaving he walked in so they could not leave.

*Additional Evidence*

Olivarez's phone contained short videos Olivarez took of herself describing where she was, for example, "see, I'm at this store," or "see, I'm at the apartment."  The last text message she sent to appellant was on January 17, 2019, and said something along the lines of, "Things are going to be different.  I promise.  I love you with all my heart."

A retired law enforcement officer with training and experience in domestic violence testified that common characteristics of domestic violence relationships include coercion and threats, intimidation, and isolation.  Abusers are often jealous and keep close tabs on the victim, and sometimes use children to control and punish the victim.

The parties stipulated that appellant had a 2013 felony conviction for domestic violence against a different female.

*Verdict and Sentence*

The jury rejected first-degree murder but found appellant guilty of second-degree murder and of corporal injury to a cohabitant, and found true an allegation as to the corporal injury charge that appellant personally inflicted great bodily injury on Olivarez.  Appellant admitted an allegation

that he suffered a prior serious felony conviction.  The court sentenced appellant to an aggregate prison term of 35 years to life.[2]

DISCUSSION

I.    *Hearsay*

Over appellant's objections, the trial court ruled the testimony relating Olivarez's out-of-court statements was admissible under the state of mind or spontaneous statement exceptions to the hearsay rule.[3]  The People concede that much of this testimony was erroneously admitted, and we agree.

A.    *State of Mind*

"Evidence Code section 1250, which authorizes the admission of out-of-court statements to prove the declarant's state of mind, permits the admission of such evidence only if the declarant's state of mind 'is itself an issue in the action' or if the evidence 'is offered to prove or explain acts or conduct of the declarant.'  (Evid. Code, § 1250, subd. (a)(1)–(2).)" (*People v. Riccardi* (2012) 54 Cal.4th 758, 814–815 (*Riccardi*), abrogated on another ground by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)  "[E]vidence of the decedent's state of mind, offered under Evidence Code section 1250, can be relevant to a defendant's motive—but only if there is independent, admissible

---

[2] This matter was transferred by California Supreme Court Order on August 9, 2022 from the Fifth Appellate District (No. F082092) to the First Appellate District.

[3] Appellant did not raise a hearsay objection to Marco's testimony, however, " '[a] court will excuse a defendant's failure to object … if an objection would have been futile.' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 853.)  By the time Marco testified, the trial court had repeatedly and consistently ruled similar testimony was admissible under the state of mind exception.  As any objection would have been futile, appellant's argument as to Marco's testimony has not been forfeited on appeal.  We note the People do not argue forfeiture.

evidence that the defendant was aware of the decedent's state of mind before the crime and may have been motivated by it." (*Riccardi,* at p. 820.) In *Riccardi*, "ample foundational evidence, independent of [the decedent's] statements, suggested that defendant was well aware that [the decedent] was fearful of him, no longer desired a relationship with him, and took actions in conformity with her fear," and that the defendant, in turn, "reacted to [the decedent's] fear and rejection and was not only motivated by it, but also sought to manipulate it." (*Id.* at p. 819.)

Here, however, the evidence that Olivarez sought to end the relationship was mixed: while she told Yvonne and Aurelia that she wanted to leave appellant, she told Mable and Jeena that she was leaving her son with her parents so she could work on their relationship. And as the People acknowledge, there was no independent, admissible evidence that appellant was aware of and possibly motivated by Olivarez's state of mind. The admission of evidence for this purpose was erroneous.

The People argue certain portions of testimony that may have been admitted pursuant to this exception were admissible. We agree the testimony of various witnesses relating their observations that Olivarez distanced herself from her family and became nervous after starting her relationship with appellant was not hearsay and was relevant circumstantial evidence that appellant was controlling and sought to isolate Olivarez. (Evid. Code, § 1200, subd. (a) [" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated."].) We also agree the portion of Desmond's testimony relating his receipt of an angry call from a man using Olivarez's phone telling Desmond not to contact his girlfriend was admissible as a statement by a party opponent and relevant to show appellant's jealousy.

9

(Evid. Code, § 1220 ["Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which [the declarant] is a party . . . ."].)

The People contend Jeena's testimony that Olivarez once asked her to call the police if she did not soon hear back from Olivarez, and Chelsea's testimony that Olivarez asked her to take care of Olivarez's son if anything happened to her, were not hearsay. We agree. (See *People v. Jurado* (2006) 38 Cal.4th 72, 117 ["Because a request, by itself, does not assert the truth of any fact, it cannot be offered to prove the truth of the matter stated."].) However, " 'A hearsay objection to an out-of-court statement may not be overruled simply by identifying a nonhearsay purpose for admitting the statement. The trial court must also find that the nonhearsay purpose is relevant to an issue in dispute.' " (*Riccardi, supra,* 54 Cal.4th at p. 814.) The People argue evidence that Olivarez made these statements is "circumstantial evidence that she was seriously worried about her safety." However, as noted above, the People have conceded Olivarez's state of mind was not relevant because there is no independent evidence appellant knew of this fear, knew she wanted to leave him because of her fear, and, as a consequence, was motivated to harm her.

B.     *Spontaneous Statements*

" 'Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception.' (Evid. Code, § 1240.) For a statement to fall within this exception, ' "it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance

10

spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it." [Citations.]' [Citation.] ' "When the statements in question were made and whether they were delivered directly or in response to a question are important factors to be considered on the issue of spontaneity. [Citations.] But . . . ['n]either lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity *if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance.'* " ' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 152 (*Penunuri*).)

Appellant does not dispute this standard was satisfied with respect to Rebekah's testimony about Olivarez asking for documentation of a disciplinary violation because she needed it to get her son back from appellant.[4]

As to Claudia's testimony, the People argue appellant's opening brief failed to contend Olivarez's statements to Claudia were not made under the stress of excitement. We disagree. Appellant identified Claudia's testimony as admitted pursuant to the spontaneous statement exception and argued as to all such statements except Rebekah's testimony noted above, "the People presented no evidence suggesting that Olivarez's statements to

---

[4] Appellant contends, and the People concede, Rebekah's testimony that she remembered telling police that Olivarez said appellant told her "why don't you just kill yourself" was not admissible as a spontaneous statement. When she testified at trial, Rebekah remembered telling police about this but did not remember the underlying conversation with Olivarez.

11

acquaintances and coworkers were made 'under the stress of excitement and while the reflective powers were still in abeyance.' " This is sufficient to preserve the argument. Claudia's testimony provided no evidence of a startling occurrence or that Olivarez was under the stress of excitement. (Cf. *Penunuri, supra,* 5 Cal.5th at pp. 152–153 [spontaneous statement exception satisfied where at the time of the statement the declarant "was out of breath" and his " 'eyes were big' "].) The admission of this testimony as a spontaneous statement was in error.

The parties dispute whether Aurelia's testimony that Olivarez said she had tried to leave appellant but he walked in as she was leaving was properly admitted as a spontaneous statement. The People argue Aurelia's testimony that Olivarez made the statements on a day when she looked depressed and had angrily argued with someone on the phone constituted sufficient evidence to admit the testimony as a spontaneous statement. We disagree. "[T]he utterance must relate to the circumstance of the occurrence preceding it." (*Penunuri, supra,* 5 Cal.5th at p. 152.) Aurelia testified Olivarez did not say when the leaving incident had taken place and was acting depressed as she told Aurelia the story. There is no evidence Olivarez's statements were made while under the stress of excitement of appellant's walking in as she was trying to leave. Accordingly, this testimony was erroneously admitted.

II.   *Prejudice*

"State law error in the admission of hearsay requires reversal of the judgment if ' "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." ' " (*People v. Turner* (2020) 10 Cal.5th 786, 823 (*Turner*).)

We have found a substantial amount of evidence was erroneously admitted: testimony that Olivarez said appellant was jealous and controlling

12

(Bobbie, Marco, Crystal, Chelsea, Jeena, and Christina); testimony that Olivarez stated directly or indirectly that she was afraid of appellant and/or wanted to leave him (Chelsea, Jeena, Yvonne, Claudia, and Aurelia); testimony that Olivarez said appellant spanked her son or she was afraid he would physically abuse her son (Bobbie and Crystal); and testimony that Olivarez said appellant had physically harmed her by giving her visible bruises or pulling her by the hair and sexually assaulting her (Crystal, Chelsea, Jeena, and Christina).

The People argue the prejudicial inference from this evidence "was basically that appellant was an abusive, controlling jerk in his relationship with [Olivarez]," and properly admitted evidence also so established. The People are correct there was other evidence that appellant was jealous and controlling: Rebekah's testimony that appellant sternly asked a male coworker why he was talking to Olivarez and her testimony that Olivarez needed documentation of a disciplinary writeup to get her son back from appellant; Desmond's testimony about an angry phone call from a man identifying himself as Olivarez's boyfriend and telling Desmond not to contact Olivarez; the videos from Olivarez's phone showing her documenting her location; testimony from various witnesses that Olivarez withdrew from her family and was nervous during her relationship with appellant; and Thomas's testimony about the incident where appellant sternly told Olivarez to go back inside the apartment.

But evidence that appellant was jealous and controlling is substantially different from evidence that appellant was *physically violent* with Olivarez and her son and that Olivarez was afraid of him. No properly admitted evidence established the latter facts, which were highly prejudicial in a case where no direct evidence identified appellant as the perpetrator. (See

13

*Turner, supra,* 10 Cal.5th at p. 825 [erroneous admission of hearsay reversible where "it provided nearly all the direct evidence" of a particular fact and "[t]he hearsay evidence was relevant to an especially important issue"]; *People v. McDaniel* (2019) 38 Cal.App.5th 986, 1007 (*McDaniel*) [reversible error where "the erroneously-admitted ... evidence was highly probative, indeed explosive"].)

To be sure, there was circumstantial evidence pointing to appellant as the perpetrator: Olivarez's apartment had not been broken into, appellant did not immediately take Olivarez to the hospital despite acknowledging a pool of blood under her head, he had injuries on his hands, and he had a prior domestic violence conviction.[5]  The admissible evidence in the case was sufficient to support a conviction, permitting a retrial.  (Cf. *People v. Eroshevich* (2014) 60 Cal.4th 583, 591 ["There is an exception to the rule permitting retrial after the defendant's successful challenge to [a] conviction: the defendant may not be retried if the judgment is reversed because, as a matter of law, the evidence was insufficient to support a conviction."].)  But the evidence was not so overwhelming as to render the erroneous admission of evidence that appellant had previously been physically abusive to Olivarez harmless.

Notably, during closing arguments, the prosecutor referenced Christina and Jeena's testimony that Olivarez said appellant dragged her by the hair

---

[5] The jury was instructed it could consider the prior domestic violence conviction as evidence appellant was likely to commit the "domestic violence offense charged in this case."  Appellant argues the jury could therefore only consider the conviction with respect to the corporal injury on a coinhabitant charge and not with respect to the murder charge.  We agree with the People that the instruction is not so limited, as the People's theory was that the murder occurred as a result of domestic violence.

and Crystal's testimony that Olivarez had visible bruises she said were from appellant. The prosecutor emphasized, "this is domestic violence that is happening several months before [Olivarez] is murdered." Later, referring to Chelsea's testimony that Olivarez told her she was afraid of appellant and asked Chelsea to take care of her son if anything happened to her, the prosecutor argued, "She was afraid. She knew that the defendant was getting more violent as the weeks were passing since he had returned from San Diego." In addition, the prosecutor spent approximately 25 percent of her argument and rebuttal reviewing the testimony of every single witness providing improperly admitted testimony. This argument supports a finding the error was prejudicial. (*People v. Clark* (2021) 62 Cal.App.5th 939, 969 [" '[F]or purposes of determining whether the error was harmless, we may consider whether the prejudicial effect is reduced by a prosecutor's closing argument.' [Citation.] 'Conversely, we may consider whether a prosecutor's closing argument to the jury exacerbated the prejudicial effect.' "].)

Finally, the record is clear that the jury struggled with the verdict. (See *McDaniel, supra,* 38 Cal.App.5th at p. 1009 [reversible error where "the record reveals that the jury found the case to be a close one and struggled to reach guilty verdicts on all counts"].) During deliberations, the jury submitted multiple questions, requested a readback of testimony from three witnesses—including Crystal's testimony about "the pictures of bruises [Olivarez] asked her to take (specifically what date that conversation took place)"—and clarification of various instructions. Most significantly, at one point during the deliberations, the jury informed the court it was unable to reach a verdict on either of the charges.[6] The People's assertion that the

---

[6] The court instructed the jury to continue deliberations.

jury's difficulty in reaching a verdict related solely to "the theory of first-degree murder" is unpersuasive. If the jury had been persuaded appellant was the perpetrator and divided only as to whether the murder was first- or second-degree, they would have had no difficulty finding him guilty on the domestic violence charge. As the prosecutor acknowledged in closing argument, "Count 2 is a charge in the alternative based on the same facts [as count 1]." The fact that the jury reported an inability to reach a verdict on either count strongly suggests the jury was divided on whether appellant was the perpetrator at all.

Accordingly, we conclude, "considering the record as a whole, there is a reasonable chance that had the complained-of evidence been excluded, the result of the proceeding would have been more favorable to [appellant]." (*McDaniel, supra,* 38 Cal.App.5th at p. 1005.)

## DISPOSITION

The judgment is reversed and remanded for a new trial. (§ 1262 ["If a judgment against the defendant is reversed, such reversal shall be deemed an order for a new trial, unless the appellate court shall otherwise direct."].)

16

_____
Simons, J.

WE CONCUR:


_____
Jackson, P. J.


_____
Wiseman, J.*


A165850


---

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.