*Jerome Thomas v. State of Maryland*, No. 1530, Sept. Term, 2023. Opinion by Tang, J.

**SEARCH, SEIZURE, AND ARREST – EXCEPTIONS TO WARRANT REQUIREMENT – EMERGENCIES AND EXIGENT CIRCUMSTANCES – OPPORTUNITY TO OBTAIN WARRANT**

Exigent circumstances exception to the warrant requirement justified the police's warrantless use of real-time cell-site location information ("CSLI") obtained from the appellant's service provider and a cell-site simulator. Police were actively pursuing a fleeing suspect who had thus far eluded them, and, given that he was accused of committing a fatal shooting, it was reasonable for police to assume the appellant was armed and posed an ongoing danger to the public.

**EVIDENCE – HEARSAY – ACQUIESCENCE OR SILENCE; ADOPTIVE ADMISSIONS**

The trial court did not err in concluding that the appellant's silence in response to the accusatory portion of his mother's text message—"You will always be family but you acted very childish right now and you're not thinking right now and *nobody told you to kill that boy*."— constituted an adoptive admission as to that statement. Two minutes after his mother sent the message, the appellant replied, "I am not your family they are," "I been didn't have any family," and "U just like the rest of your family fake as shit." Because he responded to one part of the message, a jury could reasonably infer that he read the entire message, including the accusatory statement, and had the opportunity to respond to it. Additionally, given the portion of the message he responded to and the gravity of the subject matter, a jury could reasonably conclude that a reasonable person in his position would have expressed disagreement with it.

**CRIMINAL LAW – INSTRUCTIONS – EVIDENCE JUSTIFYING INSTRUCTIONS IN GENERAL**

The trial court did not abuse its discretion in giving a jury instruction on transferred intent where there was some evidence to generate the instruction. Around midnight, a group, including the appellant, got into an altercation with a group that included the victim. At one point, the appellant was fighting another member of that group. After a pause in the fight, the appellant fatally shot the victim. A jury could have concluded that the appellant intended to shoot the person with whom he had just been fighting, and, in the darkness, mistakenly identified the victim as the other person when the appellant fired the gun.

Circuit Court for Howard County
Case No. C-13-CR-20-000208

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1530

September Term, 2023

_____

JEROME THOMAS

v.

STATE OF MARYLAND
_____

Ripken,
Tang,
Kehoe, S.,

JJ.
_____
_____

Opinion by Tang, J.
_____

Filed: May 1, 2026

Following a jury trial in the Circuit Court for Howard County, Jerome Thomas, the appellant, was convicted of first-degree murder, second-degree murder, first-degree assault, and related firearm offenses in connection with a fatal shooting.[1] The court sentenced the appellant to life imprisonment without parole for the murder and a consecutive term of ten years' imprisonment, the first five years without parole, for the firearm-related offenses. On appeal, the appellant raises the following questions, which we quote:

1. Did the circuit court err in denying appellant's motion to suppress?
2. Did the circuit court err in admitting an accusatory text message from appellant's mother?
3. Did the circuit court err in instructing the jury on transferred intent?

For the reasons that follow, we shall affirm the convictions.

## BACKGROUND

In the early hours of May 1, 2020, just after midnight, Anthony McNeil was shot and killed during an altercation in a parking lot in Columbia, Maryland. Officers from the Howard County Police Department ("HCPD") responded to the scene, began investigating the shooting, and interviewed various individuals who were present during the fight.

On May 6, the police discovered that a person with the nickname "Hammer" had been at the scene of the shooting, and a witness provided a description of him. Based on this information, the police conducted a computer search for the nickname "Hammer" and found that it was associated with the appellant.

---

[1] The case was tried twice. Senior Judge Bernhardt presided over the first jury trial, which resulted in a mistrial. The case was reassigned to Judge Porter for a new trial.

**May 13: Police Learn of Appellant's Involvement in Shooting**

On May 13, 2020, the Greenville Police Department in North Carolina contacted HCPD detectives to report a domestic incident involving the appellant and his girlfriend at the appellant's mother's home. Family members present at the scene informed the Greenville officers that the appellant and his girlfriend were involved in a shooting on May 1 in Columbia, Maryland. HCPD did not have an active warrant for the appellant at that time, so the Greenville officers released him at the scene. The appellant and his girlfriend provided their cell phone numbers to the Greenville officers.

Later that day, at 2:15 p.m., an HCPD detective applied for and obtained three ex parte court orders to track cell-site location information ("CSLI") in real time using the known cell phone numbers associated with the appellant, including those provided to the Greenville police. However, the real-time tracking information from these phone numbers yielded no leads.

**May 14: Identification of Appellant as Shooter, Arrest Warrant, and Police Pursuit**

On May 14, 2020, HCPD officers presented a photo array to a witness who identified the appellant as the shooter. Later that day, at 4:15 p.m., the police applied for and obtained a felony arrest warrant for the appellant, charging him with first-degree murder. HCPD detectives traveled to Greenville to apprehend him.

When the detectives arrived at the appellant's mother's home in Greenville, she informed them that the appellant and his girlfriend had left the day before and were staying at a local motel. She also provided the police with the appellant's current cell phone

2

number, which was different from the numbers the HCPD had used to request and obtain the ex parte court order.

**May 15: Warrantless "Emergency Situation Disclosure" and Cell-Site Simulator**

At 2:05 a.m. on May 15, 2020, the HCPD detectives visited a Super 8 Motel in Greenville, where they believed the appellant and his girlfriend were staying. They confirmed that the couple had rented a room, but motel staff reported that they might have checked out before the 11:00 a.m. checkout time.

At 2:20 a.m., with assistance from local authorities, the HCPD detectives obtained a search warrant for the motel room and executed it. However, by this time, the appellant and his girlfriend were no longer present.

At 3:41 a.m., an HCPD detective and a federal agent involved with the investigation requested an "Emergency Situation Disclosure" from Verizon. They sought real-time CSLI for the appellant's cell phone number, which his mother had provided. The requests "related to an emergency involving danger of death or serious physical injury to a person, necessitating disclosure without delay of information relating to that emergency."

After receiving the disclosure, the police traced the phone number to Womack Drive in Annapolis, Maryland. The police then responded to that area and contacted local hotels to locate the appellant and his girlfriend. They discovered that the appellant's girlfriend had rented room 122 at an Extended Stay America the previous day.

At 6:20 a.m., the police used a Stingray, a cell-site simulator, to determine that the appellant's phone was in room 122. Additionally, the police conducted physical surveillance on the room.

3

At 2:20 p.m. on May 15, the police observed the appellant leaving room 122 and arrested him. Officers retrieved a cell phone from him during the arrest.

The police obtained a search warrant to search the motel room, but did not find any weapons in the room. Officers interviewed the appellant, but he declined to make a statement.

## Appellant's Phone

The police examined the contents of the appellant's phone pursuant to a search warrant. They discovered various text messages, including an exchange between the appellant and his mother during which his mother stated, "You will always be family but you acted very childish right now and you're not thinking right now and *nobody told you to kill that boy*." (emphasis added).

The appellant moved to suppress the evidence from his cell phone. He argued that the police's use of real-time CSLI from his service provider and a cell-site simulator both constituted searches that required a warrant. Since the police did not obtain a warrant for either, and because the tracking led them to the appellant, the subsequent seizure of his phone and its contents should have been suppressed. The court denied the motion on the basis that exigent circumstances justified the use of the real-time CSLI from his service provider and the cell-site simulator.

The State moved *in limine* to introduce the above text exchange into evidence at trial. Ultimately, the court granted the motion and admitted it into evidence.[2]

We will supply additional facts as they become relevant to the discussion.

**DISCUSSION**

**I.**

**MOTION TO SUPPRESS CELL PHONE EVIDENCE**

The appellant argues that the circuit court erred in denying his motion to suppress the evidence from the phone seized pursuant to his arrest. He challenges two distinct actions by the HCPD: (1) its use of real-time CSLI tracking for a phone number associated with the appellant to determine that the phone was in Annapolis; and, once in Annapolis, (2) the police's use of a cell-site simulator to pinpoint the phone's location to a specific motel room. The appellant argues that both actions constituted searches under the Fourth Amendment, and exigent circumstances did not justify the warrantless searches.

The State does not contest that HCPD's use of real-time CSLI from the appellant's service provider and the cell-site simulator constituted searches within the meaning of the Fourth Amendment. The State argues that the warrantless use of both was justified under the exigent circumstances exception to the warrant requirement.[3]

---

[2] *See* n.1. Initially, the State presented the motion *in limine* to Judge Bernhardt before the first scheduled jury trial. Judge Bernhardt denied the motion. The State moved for reconsideration before the retrial. Judge Porter reconsidered the motion and granted it.

[3] Preliminarily, the State argues that the appellant waived his suppression challenge by conceding the lawfulness of his arrest and had no expectation of privacy in a public place. We shall not address this argument because, as the State concedes, it was not raised

(continued)

5

## A.

## Standard of Review

In reviewing a motion to suppress evidence under the Fourth Amendment, we consider the facts "in the light most favorable to the State as the prevailing party on the motion." *Grant v. State*, 449 Md. 1, 14 (2016). Our review is limited to "the information contained in the record of the suppression hearing." *Id.* Although the circuit court's factual findings will not be disturbed unless clearly erroneous, we review legal questions *de novo*. *Id.* at 14–15.

## B.

## CSLI From Service Provider v. Cell-Site Simulator

We start by clarifying the difference between CSLI obtained from a service provider and use of a cell-site simulator. When a cell phone sends or receives a call or text message, it attempts to connect with the service provider's closest cell tower. *State v. Copes*, 454 Md. 581, 588 (2017). By knowing which cell towers a cell phone has connected to (or is currently connecting to) and the physical locations of those towers, one can estimate the cell phone's geographical location. *Id.* This information is often referred to as "cell site location information" or "CSLI." *Id.* Two types of CSLI may be sought from the service provider: historical CSLI, which refers to the towers a cell phone has connected to in the

---

or decided below. *See* Md. Rule 8-131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court."); *see also Elliott v. State*, 417 Md. 413, 439 (2010) (recognizing that prejudice results "when the State's failure to raise an issue prevents the defendant from rebutting a claim or adducing evidence necessary to form defenses").

past, and real-time CSLI, which refers to the towers the phone is currently connecting to. *Id.*

In contrast, a cell-site simulator is a device that "pretends to be a cell tower on the network of the target phone's service provider." *Id.* at 589. "It takes advantage of the fact that a cell phone—when turned on—constantly seeks out nearby cell towers, even if the user is not making a call." *Id.* Equipped with identifying information about the target phone, the cell-site simulator searches for that specific device. *Id.* Once it gets close enough, the target phone connects to the simulator as if it were an actual cell tower. *Id.*

The Fourth Amendment of the United States Constitution, made applicable to the States through the Fourteenth Amendment, "guarantees individuals the right 'to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Grant*, 449 Md. at 16 (quoting U.S. Const. amend. IV). Warrantless searches and seizures are "presumptively unreasonable." *Pacheco v. State*, 465 Md. 311, 320 (2019). However, a warrantless search or seizure may be "deemed reasonable if the circumstances fall within a few specifically established and well-delineated exceptions." *Id.* at 321 (citation modified).

In *Carpenter v. United States*, 585 U.S. 296 (2018), the United States Supreme Court addressed the use of *historical* CSLI by law enforcement. There, the Government sought court orders to obtain historical CSLI for the defendant's cell phone. *Id.* at 301–02. Federal magistrate judges granted the Government's applications, thereby directing the defendant's wireless carriers to divulge cell-site information for the defendant's telephone during the four-month period during which a string of robberies occurred. *Id.* at 302.

7

In complying with the court orders, the defendant's two telephone companies produced records collectively spanning 127 days. *Id.* The Government charged the defendant with six counts of robbery and six counts of possession of a firearm during the commission of a violent crime. *Id.* The defendant moved to suppress the CSLI, arguing that "the Government's seizure of the records . . . had been obtained without a warrant supported by probable cause." *Id.* The district court denied the defendant's motion, and he was convicted on all but one of the firearm counts and sentenced to more than 100 years in prison. *Id.* at 302–03. The U.S. Court of Appeals for the Sixth Circuit affirmed, holding that the defendant lacked a reasonable expectation of privacy in his cell-site records because he voluntarily shared the information with his wireless carriers. *Id.* at 303.

The United States Supreme Court granted certiorari and reversed, concluding that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI." *Id.* at 310. The Court reasoned, in part, that "[m]apping a cell phone's location over the course of 127 days provides an all-encompassing record of the holder's whereabouts. . . . revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations." *Id.* at 311 (citation modified).

Relevant here, the Court carefully confined the scope of its holding and expressly left open the question of whether governmental collection of *real-time* CSLI constitutes a search for Fourth Amendment purposes. *Id.* at 316 ("Our decision today is a narrow one. We do not express a view on matters not before us: real-time CSLI or 'tower dumps' (a

8

download of information on all the devices that connected to a particular cell site during a particular interval).").

Maryland appellate courts have not squarely addressed whether police use of real-time CSLI from a service provider constitutes a Fourth Amendment search. However, this Court has examined whether the use of a cell-site simulator constitutes a search under the Fourth Amendment. In *State v. Andrews*, 227 Md. App. 350 (2016), the Baltimore City Police Department ("BPD") used an active cell-site simulator, without a warrant, to locate the defendant, who was wanted on charges of attempted murder. *Id.* at 354. The cell-site simulator, known under the brand name "Hailstorm," forced the defendant's cell phone into transmitting signals that allowed the police to track it to a precise location inside a residence. *Id.* at 354. BPD had also obtained real-time CSLI from the service provider when it received the GPS coordinates associated with the cell phone. *Id.* at 358 n.3. Ultimately, the police used the cell-site simulator data to find the defendant at the residence indicated and arrested the defendant pursuant to a valid arrest warrant. *Id.* at 354.

The defendant moved to suppress, focusing primarily on BPD's use of the cell-site simulator to directly obtain pinpoint location data. *Id.* at 358 n.3. We held that the State's use of a cell-site simulator is a search subject to the Fourth Amendment:

> We determine that cell phone users have an objectively reasonable expectation that their cell phones will not be used as real-time tracking devices through the direct and active interference of law enforcement. We hold, therefore, that the use of a cell site simulator, such as Hailstorm, by the government, requires a search warrant based on probable cause and

9

describing with particularity the object and manner of the search, unless an established exception to the warrant requirement applies.[4]

*Id.* at 394–95. Notably, we did not address whether the police's collection of real-time CSLI from the service provider constituted a search because the motion to suppress was primarily based on the police's subsequent use of a cell-site simulator. *See id.* at 358 n.3 ("[W]e do not address whether the real-time location information from [the service provider] should have been obtained under a warrant or special order.").[5]

In the instant case, HCPD's use of a cell-site simulator to pinpoint the phone's location to a specific motel room in Annapolis constitutes a search. Whether the use of real-time CSLI from a service provider constitutes a search remains an open question. The State contends that not all collection of real-time CSLI from a service provider necessarily constitutes a search, but it does not dispute that it was a search in this case. For purposes

---

[4] Maryland Code (2018 Repl. Vol., 2019 Supp.), Criminal Procedure Article ("CP"), § 1-203.1 authorizes a court to issue an order that allows law enforcement to obtain location information from an "electronic device" after determining from an application that there is probable cause to believe that (i) a misdemeanor or felony has been, is being, or will be committed by the individual about whom location information is being sought, and (ii) such information is evidence of or will lead to evidence of the misdemeanor or felony being investigated or will lead to the apprehension of an individual for whom an arrest warrant has previously issued. CP § 1-203.1(b)(1)(i)–(ii).

During the 2020 legislative session, after the *Andrews* decision, the General Assembly amended the statute to "appl[y] current law provisions relating to an application for an order to obtain location information by law enforcement and the duration of such an order to the use of cell site simulator technology by law enforcement." Fiscal Note, H.B. 499, 2020 Leg., 441st Sess. (Md. 2020). Accordingly, the term "Cell Site Simulator" was added to the statute. *Whittington v. State*, 246 Md. App. 451, 480 n.12 (2020), *aff'd*, 474 Md. 1 (2021).

[5] CP § 1-203.1(b)(6)(iv)(1) authorizes a court to, "if applicable, order the service provider to . . . disclose to the executing law enforcement officer the location information associated with the electronic device for the period of time authorized[.]"

10

of the discussion, then, we will assume without deciding that the use of real-time CSLI from the appellant's service provider in this case constituted a search. We now turn to whether the exigent circumstances exception to the warrant requirement justified the use of both the real-time CSLI from the service provider and the cell-site simulator.

## C.

### Exigent Circumstances

"Exigent circumstances exist when a substantial risk of harm to the law enforcement officials involved, to the law enforcement process itself, or to others would arise if the police were to delay until a warrant could be issued." *Williams v. State*, 372 Md. 386, 402 (2002). Exigent circumstances include "an emergency that requires immediate response; hot pursuit of a fleeing felon; and imminent destruction or removal of evidence." *Bellamy v. State*, 111 Md. App. 529, 534 (1996). Factors to be considered in the determination of whether exigent circumstances are present include "the gravity of the underlying offense, the risk of danger to police and the community, the ready destructibility of the evidence, and the reasonable belief that contraband is about to be removed." *Williams*, 372 Md. at 403. Also "[r]elevant to the determination . . . is the opportunity of the police to have obtained a warrant." *Dunnuck v. State*, 367 Md. 198, 205–06 (2001); *see also Carpenter*, 585 U.S. at 319–20 (emphasizing that "even though the Government will generally need a warrant to access CSLI, case-specific exceptions may support a warrantless search of an individual's cell-site records under certain circumstances," including "the need to pursue a fleeing suspect, protect individuals who are threatened with imminent harm, or prevent the imminent destruction of evidence"). Exigency is determined on a case-by-case basis.

11

*Williams*, 372 Md. at 403; *see also Lange v. California*, 594 U.S. 295, 302 (2021) (explaining that applying the exigent circumstances exception on a case-by-case basis is "most naturally considered by 'look[ing] to the totality of circumstances'" (quoting *Missouri v. McNeely*, 569 U.S. 141, 149 (2013))).

The reasonableness of a warrantless search or seizure based on exigent circumstances depends on the facts as they appeared to the officers at the time of the search or seizure. *See Wengert v. State*, 364 Md. 76, 86 (2001). The exigent circumstances exception is narrow, *Williams*, 372 Md. at 402, and the burden of proving exigent circumstances rests on the State, *Stackhouse v. State*, 298 Md. 203, 217 (1983).

We are persuaded that the exigencies of the situation in this case justified the warrantless use of both the appellant's real-time CSLI from his service provider and the cell-site simulator. Although the shooting occurred on May 1, it was not until May 13 that HCPD learned that the appellant might have been the shooter. Information obtained from the Greenville Police Department indicated the appellant's involvement in the shooting, prompting the HCPD to act urgently. Police applied for and obtained three ex parte court orders to track CSLI in real time using the known cell phone numbers associated with the appellant, but they led to a dead end.

The following day, armed with a positive identification from a photo array, the police obtained a warrant for the appellant's arrest. They traveled to North Carolina, where the appellant was last seen. First, they visited the appellant's mother's house, only to learn that he had already left. They then proceeded to a local motel where he was believed to be

staying. However, by the time they arrived—around 2 a.m., well before the 11 a.m. checkout time—the appellant had checked out.

The cell phone number provided by the appellant's mother became the only means for the police to locate the appellant. They had already exhausted other investigative avenues—such as seeking orders for three numbers associated with the appellant, which yielded no results; interviewing witnesses; and pursuing the appellant in North Carolina. Had they not obtained the warrantless CSLI from his service provider, the police risked further delays and the possibility that the appellant would continue to evade them. *See Gorman v. State*, 168 Md. App. 412, 422 (2006) (stating that whether exigent circumstances exist depends on, *inter alia*, whether there is "substantial risk of harm . . . to the law enforcement process itself . . . if the police were to delay until a warrant could be issued").

The police were actively pursuing an appellant on the run who had managed to elude them. Given that the appellant was accused of first-degree murder with a firearm, it was reasonable for the police to assume he was armed and posed an ongoing danger to the public. Indeed, in the Emergency Situation Disclosures, the police affirmed that the request related to a situation posing a danger of death or serious physical injury to a person. Therefore, the use of real-time CSLI from the appellant's service provider, which ultimately led police to locate him in Annapolis, was justified under exigent circumstances.

As noted, real-time CSLI from a service provider provides a general geographic area but lacks the precision of a cell-site simulator. While the real-time CSLI from his service provider directed police to the appellant in Annapolis, it did not specify which motel he

13

was at; police inquiries directed to local motels helped them identify the Extended Stay motel. Additionally, although a motel staff member indicated that the appellant's girlfriend had rented the room, it was unknown whether the appellant was actually in the room, elsewhere within the building, or in the vicinity outside the motel.[6] For the same reasons that the police's use of real-time CSLI from his service provider satisfied the exigency exception, the use of the cell-site simulator to accurately locate and confirm the appellant's presence in the Annapolis motel room was also justified by exigent circumstances.

The appellant contends that there was neither an imminent nor a continuing threat, that the police were not in "hot" pursuit of him, and that they could have obtained a warrant or court order to track the appellant's phone and use the cell-site simulator. We are not persuaded. First, an immediate or continuing threat is one example of exigent circumstances. As the appellant acknowledges in his brief, *Carpenter*, *supra*, recognized that the sort of exigent circumstances that may excuse the warrantless tracking of a cell phone in a particular case includes "the need to pursue a fleeing suspect," 585 U.S. at 319–20, a circumstance that we have already concluded was established by the evidence.

Second, "hot pursuit means some sort of a chase, but it need not be an extended hue and cry in and about (the) public streets." *United States v. Santana*, 427 U.S. 38, 42–43 (1976) (citation modified). The fact that the shooting occurred two weeks before the request for real-time CSLI from the appellant's service provider does not undermine the

---

[6] As the appellant's counsel acknowledged at the suppression hearing, the real-time CSLI from his service provider led police to the "area either immediately surrounding the motel or the motel itself, but they d[idn't] have a way to know, one, if the phone [wa]s active and in a specific room, and two, which room that is."

14

exigency. The police did not fully identify the appellant as the shooter until two weeks after the incident, by which time he had already fled to North Carolina. By the time the police arrived in North Carolina to apprehend the appellant at a motel, he had already left, indicating he was still evading them. After learning his current phone number, the police promptly requested real-time CSLI from his service provider to locate him.

Finally, the argument that the police could have obtained a warrant does not negate the exigency of the situation. Exigency is evaluated on a case-by-case basis, considering the totality of circumstances. *See Williams*, 372 Md. at 403; *Lange*, 594 U.S. at 302. Other factors supporting the existence of exigency included the seriousness of the underlying offense, the potential danger to both the police and the community, and the appellant's demonstrated attempts to evade law enforcement.

Viewing the facts as they appeared at the time and in the light most favorable to the State as the prevailing party, *see Williamson v. State*, 413 Md. 521, 531–32 (2010), we find no error in the circuit court's conclusion that the use of real-time CSLI from the appellant's service provider and a cell-site simulator was justified under the exigent circumstances exception to the warrant requirement. Accordingly, we affirm the court's denial of the appellant's motion to exclude the challenged evidence.[7]

---

[7] The State argues that, in the alternative, the police had a good faith basis for believing that exigent circumstances existed, any Fourth Amendment violation was attenuated from the seizure of the appellant's phone, and the doctrine of inevitable discovery applied to the use of the cell-site simulator. Given our disposition, we need not address these alternative arguments.

## II.

## TEXT MESSAGES

The appellant contends that the circuit court erred by admitting an accusatory text message from his mother as evidence that he had killed Mr. McNeil. The challenged message and the appellant's responses to it, which were exchanged on May 7, 2020—six days after the fatal shooting—read as follows:

> [APPELLANT'S MOTHER] [6:38 p.m.]: You will always be family but you acted very childish right now and you're not thinking right now and *nobody told you to kill that boy.*
>
> [APPELLANT] [6:40 p.m.]: I am not your family they are
>
> [APPELLANT] [6:40 p.m.]: I been didn't have any family
>
> [APPELLANT] [6:42 p.m.]: U just like the rest of your family fake as shit

(Emphasis added).

Ultimately, the court admitted the text exchange as an adoptive admission. At trial, the court gave the following jury instruction:

> You have heard evidence that [the appellant] was accused of a crime via a text message and that [he] did not deny or object to the accusation. You cannot consider the text messages as evidence unless you find under the circumstances that [the appellant] was aware of, understood, and acquiesced to the statement, and that it was made under such circumstances that [he] would deny it if it were not true. Then you may consider whether the [appellant's] silence was an admission of the truth of the accusation.

The appellant argues that the court erred in admitting the text exchange under the tacit admission exception to the hearsay rule. Specifically, he argues that the tacit admission exception does not apply because it is ambiguous whether the appellant adopted his mother's statement that he "kill[ed] that boy."

16

## A.

## Standard of Review

"[T]he trial court's ultimate determination of whether particular evidence is hearsay or whether it is admissible under a hearsay exception is owed no deference on appeal, but the factual findings underpinning this legal conclusion necessitate a more deferential standard of review." *Gordon v. State*, 431 Md. 527, 538 (2013). "Accordingly, the trial court's legal conclusions are reviewed de novo, but the trial court's factual findings will not be disturbed absent clear error." *Id.* (citation modified).

## B.

## Maryland Rule 5-803

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5-801(c). Hearsay is generally inadmissible, *see* Md. Rule 5-802, but that rule is subject to myriad exceptions. One such exception is set forth under Rule 5-803(a), which provides that a "[s]tatement by party-opponent" is "not excluded by the hearsay rule, even though the declarant is available as a witness," when the party-opponent "has manifested an adoption or belief in [the] truth" of that statement. This exception is known as an "adoptive admission." *Gordon*, 431 Md. at 539.

Adoptive admissions "may be implied through the affirmative conduct or, in the case of 'tacit admissions,' the silence or inaction of a party." *Briggeman v. Albert*, 322 Md. 133, 137 (1991). "A tacit admission occurs when one remains silent in the face of accusations that, if untrue, would naturally rouse the accused to speak in his or her

17

defense." *Id.* at 138. To conclude that a party has adopted another's statement as a tacit admission, the court must find that (1) the party heard and understood the statement; (2) at the time, the party had the opportunity to respond; and (3) under the circumstances, a reasonable person in the party's position who disagreed with the statement would have voiced that disagreement. *Henry v. State*, 324 Md. 204, 241–42 (1991).

When deciding whether to admit an adopted statement,

> [T]he judge must make a preliminary determination whether a jury could reasonably conclude that the defendant unambiguously adopted another person's incriminating statement. If the judge answers that question in the affirmative and admits the evidence, then the jury's function is to decide whether it *should* reach the conclusion which the judge has held that it *may* reach, namely that there was unambiguous assent.

*Gordon*, 431 Md. at 547 (alterations in original). "Thus, on appeal of an allegedly erroneous admission of evidence as an adoptive admission, the question is not whether the evidence before the judge clearly proved that the person against whom the statement was admitted unambiguously adopted the statement." *Id.* "Rather, the question is whether there is sufficient evidence from which a jury *could* reasonably conclude that the defendant unambiguously adopted another person's incriminating statement." *Id.* (citation modified).

"[W]hether a declarant manifested an adoption or belief in the truth of a statement of another so as to constitute an adoptive admission by the party-opponent under Maryland Rule 5-803(a)(2) is a preliminary factual determination to be made by the trial court." *Id.* at 550. Accordingly, we review the circuit court's finding that the appellant's silence constituted a tacit admission for clear error. *Id.*

18

## C.

## Analysis

The text message at issue, in which the appellant's mother impliedly asserted that he had killed someone, was hearsay. *See* Md. Rule 5-801. It is an out-of-court statement, and the State offered it as evidence that the appellant acknowledged the truth of the matter it impliedly asserts—that he was the shooter. The question before this Court, then, is whether there was sufficient evidence before the circuit court from which a jury *could* reasonably have concluded that (1) the appellant saw and understood his mother's accusatory statement; (2) at the time, the appellant had an opportunity to respond; and (3) under the circumstances, a reasonable person in the appellant's position who disagreed with the statement would have voiced that disagreement. *See Henry*, 324 Md. at 241–42.

There was sufficient evidence from which the jury could reasonably conclude that the appellant manifested an adoption or belief in the truth of his mother's implied statement that he "kill[ed] that boy." This statement was made in the same message in which she told him they would "always be family." The appellant's nearly immediate response focused on their family relationship and did not address the accusation that he was the shooter. Since he responded to one part of the message, a jury could reasonably infer that he read the entire message, including the accusatory statement, and had the opportunity to respond to it. Furthermore, based on the portion he chose to respond to and the gravity of the subject matter, a jury could reasonably conclude that someone in the appellant's situation would have expressed disagreement with the accusation. Therefore, the court's determination that

the appellant's silence regarding the accusatory part of the text message represented an adoptive admission was not clearly erroneous.

The appellant contends that his failure to explicitly deny an accusation made during a heated, private text exchange with his mother does not provide a sufficient factual basis to conclude that he acquiesced to the truth of the accusation. The appellant relies on two out-of-state cases—*People v. McDaniel*, 251 Cal. Rptr. 3d 519 (Cal. Ct. App. 2019), and *State v. Hill*, 431 P.3d 1044 (Wash. Ct. App. 2018)—to support his argument that not responding to part of his mother's message was not an adoptive admission that he was the shooter. However, both cases are distinguishable from the circumstances here.

In *McDaniel*, the defendant was charged with ten counts of robbery. 251 Cal. Rptr. 3d at 522. Before trial, the prosecution sought to admit a text message exchange between him and his mother, citing the adoptive admission exception to the state's hearsay rule. *Id.* at 527–28. That exchange unfolded over a span of twenty minutes and read as follows:

> [McDANIEL]: Stop telling lies!!!
>
> [McDANIEL]: That's why Johnny left yo nasty ass.
>
> [MOTHER]: U r the 1 who needs to learn how 2 respect. I am ur mother and ur days are number
>
> [McDANIEL]: Why are you so hateful
>
> [MOTHER]: *An that is why u will b locked up 4 robberey of the stores in this area*
>
> [MOTHER]: Why do you feel u hv 2 b so nasty an fowl ur sick

*Id.* at 528 (emphasis added). The appellant did not respond to the mother's last two messages.

20

In relevant part, the prosecution argued that McDaniel's "failure to respond to his mother['s] last text message where she accused him of committing the robberies in the area is admissible as an adoptive admission by [McDaniel] that he committed these robberies." *Id.* at 528. The court admitted the exchange as an adopted admission, and McDaniel was convicted. *Id.*

On appeal, the California Court of Appeal reversed. Preliminarily, the court recognized that "text messages may not be read immediately upon receipt and the recipient may not timely respond to a text message for any number of reasons" and "people exchanging text messages can typically switch, relatively quickly and seamlessly, to other forms of communication, such as a phone call, social-media messaging, or an in-person discussion, depending on the circumstances." *Id.* at 529.

> [I]n light of the distinctive nature of text messaging, the receipt of a text message does not automatically signify prompt knowledge of its contents by the recipient, and furthermore, the lack of a *text* response by the recipient does not preclude the possibility that the recipient responded by other means, such as a phone call.

*Id.*

The court explained that the "text exchange at issue here was not instantaneous but rather unfolded over a 20-minute period until it stopped;" "[t]here was no evidence as to whether and when McDaniel read the text message in which his mother suggested he had robbed multiple stores;" and "[t]o the extent he read it, it was entirely possible he responded to it by calling his mother or talking to her in person." *Id.* at 530. "Considering the distinctive nature of text messaging, the instant record provides *no basis* for a conclusion,

21

in the first instance, that McDaniel, with knowledge of his mother's statement, in fact *failed to deny or respond* to it and, in turn, that he thereby adopted it." *Id.*

The court added that the exchange at issue encapsulated a heated argument between him and his mother:

> Furthermore, the text exchange at issue captured a heated argument between McDaniel and his mother in which McDaniel had emphatically texted his mother, "Stop telling lies!!!" Given that McDaniel had angrily demanded that his mother "[s]top telling lies," the prosecution could not reasonably establish that a putative failure to contradict his mother's subsequent text to the effect that he would "b locked up 4 robberey [*sic*] of the stores in this area" constituted an *admission by him* that he had committed the robberies she referenced. Indeed, to the extent his mother's texts were based on newspaper articles or police flyers about the robberies, any failure to respond may well have reflected McDaniel's frustration with his mother, rather than an admission of guilt as to the commission of the robberies.

*Id.* (citation modified).

The appellant focuses on the *McDaniel* court's remarks about the heated argument between mother and son as comparable to the facts at hand. However, he ignores the primary basis on which that court decided the case. As discussed, the *McDaniel* court reversed the trial court primarily because there was no evidence that McDaniel had actually failed to respond to or deny his mother's assertion. *Id.* The text exchange in *McDaniel* occurred over a period of twenty minutes, during which McDaniel did not reply to his mother's final texts accusing him of the robberies. *Id.* There was no evidence indicating that McDaniel had actually read and understood the messages, nor was there any indication that he had not responded in person or via phone. *Id.* In contrast, the appellant here responded to the message containing the accusatory statement two minutes after it was

sent, using the same medium, i.e., text message. Therefore, the appellant's reliance on

*McDaniel* is unavailing.

The appellant also cites *State v. Hill*, 431 P.3d 1044 (Wash. Ct. App. 2018), as

directly on point to counter a finding of an adoptive admission. There, Hill was charged

with a domestic violence offense. *Id.* at 1047. The trial court admitted text messages

between him and the victim as adoptive admissions. *Id.* at 1050. The relevant text messages

were as follows:

> [VICTIM]: Yes, last time I saw you . . . you pulled my hair for 3 hours and explained how you felt and I was not able to say anything but pee on myself, so yeah
>
> [HILL]: U said lets be adults so lets do that
>
> [VICTIM]: I am an adult, I don't beat people up or call them to let them know how someone fucks
>
> [HILL]: Just talk mess and instangate [sic]
>
> [VICTIM]: Ok good bye
>
> [HILL]: Why do u act like that thats not adult
>
> . . . .
>
> [HILL]: Treat me as u want to be treated
>
> [VICTIM]: Meaning you must like people to cheat on you, bully you and lay hands on you . . . now makes sense
>
> [HILL]: No I wanted someone that wouldnt give up on me
>
> [VICTIM]: Omg ok
>
> [VICTIM]: Yeah I shouldn't have given up on you cheating, calling other women and being emotionally and physically abused, oh yeah what idiot would give up on that?
>
> [HILL]: For once u need to think a little more in depth to yourself of what was going on?
>
> [HILL]: If u knew how much I love u.

23

*Id.* at 1052.

Hill argued that because he did not acquiesce or accede in the accusatory statements made by the victim, there were "insufficient foundational facts from which the jury reasonably could conclude he acquiesced in the truth of the statements." *Id.* at 1053. The State characterized Hill's text responses as "deflection," claiming that under the circumstances, "deflection" was acquiescence because Hill did not disagree with, deny, contradict, or object to the statements. *Id.*

The Court of Appeals of Washington disagreed with the State on three grounds. *Id.* First, it explained that "deflection is not the same as acquiescence." *Id.* ("To 'deflect' means 'to turn aside: deviate from a straight line or from a position, course, or direction.' To 'acquiesce' means 'to accept or comply tacitly or passively: accept as inevitable or indisputable.'" (citation modified)). Second, Hill "respond[ed] to the accusatory text messages and d[id] not acquiesce or accede to the assertions." *Id.* Third, "[a]lthough text messages have much in common with other means of communication, it is a unique form of communication that is a truncated, raw and immediate means of communication." *Id.* (citation modified). The court therefore concluded that the trial court abused its discretion in ruling that there were sufficient foundational facts from which a jury could conclude Hill acquiesced or acceded to the accusatory text message statements. *Id.* at 1054.

The circumstances in *Hill* are distinguishable from those in the present case. Here, when the appellant's mother texted him, "You will always be family but you acted very childish right now and you're not thinking right now and nobody told you to kill that boy," the appellant did not deflect from her comments or change the subject. Instead, he directly

24

addressed the first part of her message by replying, "I am not your family they are," "I been didn't have any family," and "U just like the rest of your family fake as shit."

Unlike in *Hill*, where the defendant responded to the accusatory text messages, the appellant did not respond to the accusatory portion of the message—"nobody told you to kill that boy"—and remained silent instead. The overall tone of the exchange suggests that the mother was reaching out to affirm their familial bond despite the appellant's actions in "kill[ing] that boy." Under these circumstances, a reasonable person in the appellant's position, who disagreed with the accusation, would have expressed that disagreement. Therefore, the court did not clearly err in concluding that the appellant's silence in response to the accusatory portion of the text message constituted an adoptive admission as to that statement.

## III.

### JURY INSTRUCTION ON TRANFERRED INTENT

The appellant claims that the court erred by giving the following instruction on transferred intent:

> Now if someone intends to kill one person, but by mistake or accident kills another person, the crime is the same as if the intended person has been killed. In this case, the State has offered evidence that the Defendant intended to kill a particular person, but actually killed another person, Anthony McNeil.

> You may find that the Defendant acted with the intent to kill if you find that the State has proven that the Defendant had the intent to kill the intended person, that the Defendant was acting with that intent when Anthony McNeil was killed and that the Defendant actually killed Anthony McNeil.

> In other words, if the actual result the Defendant intended is different from what he contemplated only because another person was killed, you may find that the State has proven the Defendant intended to kill that other person.

25

The appellant argues that the court erred by giving this instruction because there was no evidence that he intended to kill someone other than Mr. McNeil.

**A.**

**Additional Background**

The large fracas that ultimately led to Mr. McNeil's death began with a dispute involving his cousin, Jaquan Newton, and several individuals in the neighborhood at Nightmist Court in Columbia, Maryland. Mr. Newton had "some issues" with a particular group of people living there and wanted Mr. McNeil to accompany him to help "resolve or mediate the situation." Mr. McNeil agreed and went with Mr. Newton to meet this group.

Mr. McNeil's girlfriend, who was present and witnessed the shooting, testified that it was close to midnight, "so it was dark outside." Mr. Newton's group included Mr. McNeil and several others, and they confronted another group of about five people, which eventually grew.

A fight broke out between Mr. McNeil and a member of the opposing group. They separated temporarily, but soon after, another altercation began. Following a pause in this second fight, Mr. Newton got into a third altercation, this time with the appellant.

At some point, Mr. Newton separated from the appellant while Mr. McNeil stood off to the side. The appellant then approached and shot Mr. McNeil. After firing the first shot, the appellant turned to walk away but fired again.

The prosecutor's primary theory was that the appellant intended to kill Mr. McNeil. However, the prosecutor requested an additional jury instruction on transferred intent. The defense objected to the instruction, arguing that it was not generated by the evidence. The

26

prosecutor contended that since there was no clear motive, the jury could conclude that the appellant intended to shoot "any number of people who were present."

The court overruled the objection. It explained that the jury heard evidence that there "was an intended fight between two individuals who both . . . brought their entourage on each side and then those sides grew." While "there's slim evidence," it was satisfied that the State met "at a very basic level, the ability to include the transferred intent instruction."

## B.

## Standard of Review

A trial court's decision to give a particular jury instruction is reviewed for abuse of discretion. *Wright v. State*, 474 Md. 467, 482 (2021). A trial court abuses its discretion if it commits an error of law in giving an instruction. *Id.* "The threshold determination of whether the evidence is sufficient to generate the desired instruction . . . is reviewed de novo." *Hollins v. State*, 489 Md. 296, 309 (2024) (citation modified).

## C.

## Analysis

"The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding." Md. Rule 4-325(c). Pursuant to Md. Rule 4-325(c), a circuit court must give a requested jury instruction when "(1) the requested instruction is a correct statement of the law; (2) the requested instruction is applicable under the facts of the case; and (3) the content of the requested instruction was not fairly covered elsewhere in the jury instruction actually given." *Rainey v. State*, 480 Md. 230, 255 (2022).

The dispute in the present case concerns the second requirement—applicability. Here, the relevant inquiry is whether there was a "minimum threshold of evidence necessary to establish a *prima facie* case that would allow a jury to rationally conclude that the evidence supports the application of the legal theory desired." *Id.* Put another way, there must be "some evidence" sufficient to raise the jury issue. *Arthur v. State*, 420 Md. 512, 525 (2011). The "some evidence" requirement is a "fairly low hurdle" that "need not even rise to the level of a preponderance." *Jarvis v. State*, 487 Md. 548, 564 (2024). "[W]hether some evidence exists is viewed in the light most favorable to the requesting party." *Id.*

We conclude that there was some evidence from which a jury could reasonably infer that the appellant intended to shoot someone other than Mr. McNeil. At Nightmist Court, Mr. Newton's group met with an opposing group, resulting in three separate fights. Notably, one of these altercations involved the appellant and Mr. Newton, who broke away from the appellant, while Mr. McNeil stood off to the side before the appellant began firing. A jury could have found that the appellant's intended target was Mr. Newton—given their recent physical confrontation—and that, due to the darkness, the appellant mistakenly identified Mr. McNeil as Mr. Newton when he fired the gun. Accordingly, the court did not err or abuse its discretion in giving the requested jury instruction on transferred intent.

**JUDGMENTS OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**